JULIA A. OLSON  (Cal. State Bar # 192642)
Wild Earth Advocates
2985 Adams Street
Eugene, OR 97405
541-344-7066
541-344-7061 (fax)
email: jaoearth@aol.com

SHARON E. DUGGAN  (Cal. State Bar # 105108)
Law Offices of Sharon E. Duggan
370 Grand Avenue Suite 5
Oakland, California  94610
Tel: (510) 271-0825
Fax: (510) 271-0829
email:  foxsduggan@aol.com

PETER M.K. FROST (Oregon Bar # 91184) applicant *pro hac vice*
Western Environmental Law Center
1216 Lincoln Street
Eugene, Oregon  97401
541-485-2471
541-485-2457 (fax)
e-mail: frost@westernlaw.org

Counsel for Plaintiffs CALIFORNIANS FOR
ALTERNATIVES TO TOXICS, WILDERNESS WATCH,
THE FRIENDS OF SILVER KING CREEK,
LAUREL AMES and ANN MCCAMPBELL

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| CALIFORNIANS FOR ALTERNATIVES TO TOXICS, a non-profit corporation; WILDERNESS WATCH, a non-profit corporation; THE FRIENDS OF SILVER KING CREEK, a California non-profit corporation, LAUREL AMES, an individual and ANN MCCAMPBELL, an individual,<br><br>      Plaintiffs,<br><br>      v.<br><br>U.S. FISH AND WILDLIFE SERVICE; ALEXANDRA PITTS, in her official capacity; JOHN MCCAMMAN, in his official capacity,<br>      Defendants. | Case No.:<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF<br><br>(National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.*; Wilderness Act, 16 U.S.C. §§ 1131 *et seq.*; Endangered Species Act, 16 U.S.C. §§ 1531 *et seq.*; Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*; California Environmental Quality Act, Cal. Pub. Res. Code §§ 21100 *et seq.*) |

Californians for Alternatives to Toxics, Wilderness Watch, The Friends of Silver King Creek, Laurel Ames and Dr. Ann McCampbell ("Plaintiffs") hereby respectfully request that this Court declare unlawful and set aside the joint Paiute Cutthroat Trout Restoration Project Final Environmental Impact Statement/Environmental Impact Report ("EIS/EIR"), issued by the U.S. Fish and Wildlife Service ("USFWS") and the California Department of Fish and Game ("CDFG"), as well as their decisions authorizing a project that will poison aquatic life in a wilderness stream to ostensibly restore a fish species in the Carson-Iceberg Wilderness in the Humboldt-Toiyabe National Forest in the Sierra Nevada in California.

<u>JURISDICTION AND VENUE</u>

1.     This action is brought pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, and its implementing regulations, the Wilderness Act, 16 U.S.C. §§ 1131 *et seq.*; the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq.*; Federal Water Pollution Control Act ("CWA"), 33 U.S.C. §§ 1251 *et seq.* and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, challenging USFWS's decision to authorize the project.  This Court has jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises under the laws of the United States.  An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a).  This court may grant declaratory relief and additional and injunctive relief, pursuant to 28 U.S.C. §§ 2201 and 2202, and 5 U.S.C. §§ 705 and 706.

2.     This action is also brought pursuant to 28 U.S.C. § 1367(a), which gives the Court supplemental jurisdiction to decide pendent state law claims under the California Environmental Quality Act ("CEQA"), Pub. Res. Code § 21100 *et seq.*, against CDFG, due to its jurisdiction over John McCamman, Director of CDFG.  It is in the interest of judicial economy and equity that this Court adjudicates Plaintiffs' claims against CDFG.

3.     Venue lies in this judicial district by virtue of 28 U.S.C. § 1391(e).  USFWS and CDFG have offices in this district, and the events or omissions giving rise to the claims arise in this district.

4.     This action is related to another case heard and resolved by Judge Frank C. Damrell, Jr. regarding virtually the same proposed project.  *Californians for Alternatives to Toxics v. Troyer, et al.*, Civ. S–05–1633 FCD KJM, 2005 WL 2105343 (E.D. Cal. Aug. 31, 2005).

## PARTIES

5.     Plaintiff CALIFORNIANS FOR ALTERNATIVES TO TOXICS ("CATs") is a nonprofit public interest group, which has advocated on behalf of its members regarding pesticide use by the State of California and the federal government for more than 23 years. CATs' office is based in Eureka, California.  CATs seeks to voice and advocate public concerns regarding toxic chemicals in the environment through organizing, education, advocacy and building community leadership. This mission is grounded in a broader concern about the sustainability of the environment.  CATs and its members are actively involved in local, regional, national and international governmental and regulatory processes concerning the use of toxic chemicals, including aquatic pesticides.  Members of CATs depend for their livelihood, health, culture and well-being on the health and productivity of forests in California, including the Humboldt-Toiyabe National Forest.  Members of CATs live near or visit the Humboldt-Toiyabe National Forest, including the Silver King Creek area of the Carson-Iceberg Wilderness ("Project Area").  CATs members drink water that is discharged from the Project Area.  CATs members also observe, study, recreate, gather or otherwise enjoy the biologic, scientific, and aesthetic benefits of the Project Area. CATs members have an interest in knowing that the

Project Area exists in its natural state, alive with wildlife, still beautiful and available to visit when they choose. The entire Project Area is a valuable asset to CATs members. No member of CATs has been compelled to participate in this lawsuit.

6. Plaintiff WILDERNESS WATCH is a nonprofit organization registered in Montana whose mission is to provide citizen oversight to ensure the long term preservation of America's wilderness and wild and scenic rivers. Wilderness Watch is the only organization dedicated solely to monitoring and protecting wilderness and wild and scenic rivers nationwide. Wilderness Watch is headquartered in Missoula, Montana, and has chapters in Mammoth Lakes and Sonora, California. Members of Wilderness Watch enjoy backpacking, hiking, snowshoeing, horse packing, fishing, and other nonmotorized activities in the Carson Iceberg Wilderness, in which they seek to experience the beauty, the diverse ecology, the pristine waters, peace, and the solitude found within the area. Wilderness Watch members are concerned about the poisoning of streams in Wilderness Areas and the adverse effects to water quality and aquatic species. No member of Wilderness Watch has been compelled to participate in this lawsuit.

7. THE FRIENDS OF SILVER KING CREEK is a nonprofit organization registered in California whose mission is to protect the Sierra Nevada from unwarranted poisoning on the pubic lands, forests, and waters that comprise thousands of acres in the Sierra. The Friends of Silver King Creek is the only organization in the Sierra focused on projects that are reliant on poison to manage the public land. Members of Friends of Silver King Creek actively participate in hiking, back-country skiing, backpacking, and other muscle-powered activities in the Sierra Nevada. The Friends of Silver King Creek are based in Markleeville, California and near to the Carson-Iceberg Wilderness, the Pacific Crest Trail, and adjacent roadless forests in the Sierra. The members of Friends of Silver King Creek are particularly concerned with the impacts of

poison on all ecosystems of the Sierra, recognizing that poisons used for fish management, weed control, and shrub reduction are non-target poisons that impact the water, the land, the vegetation, the animals as well as the invertebrates, fungi, and more.  The members are also concerned that the management actions using poisons have the strong likelihood to significantly alter the structure and function of creeks, forests, meadows, and other habitats.   No member of Friends of Silver King Creek has been compelled to participate in this lawsuit.  Plaintiff

8.    Plaintiff LAUREL AMES is an individual and a former board member of the Lahontan Water Board, appointed by Governor Ronald Reagan.  Ms. Ames has been a resident of the eastern Sierra for five decades, during which time she has hiked and backpacked throughout the Sierra Nevada.  She recreates in the Silver King Creek area, and is concerned about the impacts this project would have on beneficial uses of water, and on her recreational experiences.  She is also concerned about the ongoing use of rotenone throughout the Sierra Nevada.

9.    Plaintiff ANN MCCAMPBELL, MD, is an individual who lived most of her life in California where she has enjoyed and recreated in the Sierra Nevada.  She is a physician with an interest in environmental health and a passion for protecting wilderness areas.  Because of her concern about the adverse impacts of pesticides on humans and the environment, she has been an advocate of integrated pest management (IPM) for the past twelve years.  She is particularly concerned about the widespread practice of putting poisonous substances in pristine waters for the purpose of native fish restoration.

10.    The health, recreational, scientific, cultural, inspirational, educational, aesthetic and other interests of Plaintiffs will be adversely and irreparably injured by defendants' failure to comply with NEPA and its implementing regulations, unless the relief requested here is granted.

These are actual, concrete injuries to Plaintiffs that would be redressed by the relief sought. Plaintiffs have no adequate remedy at law. In order to safeguard their interests, Plaintiffs actively participated in the public planning process for the rotenone project, both at the federal and state levels. Plaintiffs commented during scoping, on the Draft EIS/EIR and on the Final EIS/EIR.

11.    U.S. FISH AND WILDLIFE SERVICE is a lead agency for the project and is the agency responsible for preparing the EIS/EIR and approving the project.

12.    ALEXANDRA PITTS is the Acting Deputy Regional Director of the U.S. Fish and Wildlife Service and is sued in her official capacity. Alexandra Pitts signed the Record of Decision authorizing the project.

13.    JOHN MCCAMMAN is the Director of the California Department of Fish and Game and is sued in his official capacity. John McCamman signed the decision certifying the EIS/EIR, adopting the mitigation and monitoring and reporting program, adopting the findings under CEQA and adopting the statement of overriding considerations. California Department of Fish and Game is the California state public agency responsible for properly managing and protecting California's fish and wildlife, for their public ecological, recreational, and other values, and is the state agency which certified and approved the Final EIS/EIR.

<u>SUMMARY</u>

14.    This action challenges the decision of USFWS and CDFG to poison with rotenone 11 miles of the Silver King Creek, including tributaries and backwaters, in the Carson-Iceberg Wilderness of the Humboldt-Toiyabe National Forest in California, for the purpose of killing non-native fish as part of a recovery effort for Paiute cutthroat trout, without fully complying with the mandates of NEPA, the Wilderness Act and CEQA.

15.    The project will also result in a violation of the Water Quality Control Plan for the Lahontan Region (Basin Plan), the Federal Water Pollution Control Act (the "Clean Water Act" or "CWA"), 33 U.S.C. §§ 1251 et seq., and the Porter-Cologne Water Quality Control Act ("Porter-Cologne Act"), Water Code §§ 13000 et seq.

16.    For decades, CDFG has stocked non-native species of trout in wilderness lakes and streams throughout California.  Non-native trout can outcompete or interbreed with native trout.  Largely because of stocking, populations of native trout species have declined to the point where certain species have been listed as threatened or endangered under the Endangered Species Act ("ESA").  However, CDFG continues and encourages the practice of stocking non-native fish.

17.    Subsequent to the decline of certain native trout species, CDFG implemented projects in different stream systems in California to kill non-native fish, and reintroduce native trout.  Rotenone is the most common aquatic pesticide used to remove non-native fish.  Rotenone interferes with oxygen use and is especially toxic to organisms that obtain oxygen from water, such as fish, amphibians and aquatic invertebrates. Certain species of aquatic invertebrates are particularly susceptible to long-term or permanent extirpation from streams poisoned by rotenone.  Rotenone also has indirect lethal and sublethal effects because amphibians, birds and other species will likely suffer from depleted food sources as rotenone will decrease insect populations and other macroinvetebrates and will eliminate fish populations.

18.    Applying non-specific poisons to whole aquatic communities for the goal of creating another population of a single fish is unacceptable from an ecological perspective.  The Silver King stream system has a high probability of containing rare and/or endemic aquatic macroinvertebrates and amphibians. The preferred alternative would cause long-term changes to

the structure and function of the biological community, as demonstrated by past monitoring of non-target species in other reaches of the Silver King Creek system.

19.     CDFG has used rotenone at least eight separate times and antimycin one time in other reaches of the Silver King system in the past 40 years.  The proposed poisoning of 11 miles of Silver King Creek would complete the poisoning of almost the entire Silver King Creek.

20.     The project is unnecessary for the recovery or survival of Paiute cutthroat trout, and may not result in permanent removal of non-native fish.  The Paiute cutthroat trout is already established in 11.5 miles of this stream system, which includes five tributary creeks in the same watershed and in four other streams in other watersheds.  Together, these stream reaches surpass the species' known historic range.  CDFG intends to continue stocking with non-native trout downstream areas that are hydrologically connected to the portion of Silver King Creek that it has decided to poison with rotenone.  Downstream falls do not function as complete barriers to fish migration.  Further, it is possible that a "bucket biologist" could reinfect the project area with a non-native trout.

## BACKGROUND

21.     The Humboldt-Toiyabe National Forest is graced with numerous natural treasures, including the streams and lakes of the Carson-Iceberg Wilderness.  The Carson-Iceberg Wilderness is the home to many species, which are threatened with adverse impacts from pesticide use, grazing, development and other activities that disrupt ecosystem functioning.  The Forest Service has jurisdiction over these federal public lands and must protect and administer them pursuant to the Wilderness Act.

22.     The project has been proposed several times.  On May 29, 2002, CDFG filed a CEQA Mitigated Negative Declaration and a Notice of Determination on April 10, 2003, for the

proposed Paiute Cutthroat Trout Recovery Project.  On July 31, 2002, the Forest Service issued

for public comment an Environmental Assessment ("EA") under NEPA for the same proposed

project.  On March 13, 2003, the Forest Service wrote a letter to those who commented on the

EA, indicating that it would not issue a final NEPA decision, but instead would use a "minimum

tools analysis" to determine whether to allow the proposed project, or some modified version of

it, within the wilderness.  The Forest Service later approved the rotenone project without

formally responding to public comments on its EA, and without issuing a decision document

under NEPA that would have been subject to administrative appeal.  After being sued by the

Center for Biological Diversity, the Forest Service entered into a settlement agreement with

those plaintiffs whereby it agreed to withdraw its approval for the project and prepare an EA or

EIS in full compliance with NEPA.

23.     After public review of a new draft EA, on April 30, 2004, the Forest Service

signed a Finding of No Significant Impact, which adopted the Paiute Cutthroat Trout Recovery

Project's poisoning alternative.  On May 5, 2004, the Forest Service issued another EA.  In the

summer of 2005, CDFG petitioned the State Water Resources Control Board ("State Board") to

adopt a Clean Water Act discharge permit for the Paiute Cutthroat Trout Recovery Project, after

the Lahontan Regional Water Quality Control Board ("Lahontan Board") declined to do so.  On

July 6, 2005, the State Board adopted a Water Quality Order issuing the permit to CDFG,

allowing the rotenone project to proceed.

24.     CATs, Wilderness Watch, Laurel Ames, and Ann McCampbell filed suit in this

Court challenging the Forest Service's decision approving the 2004 project.  The case was

docketed as No. Civ. S–05–1633 FCD KJM. Judge Damrell issued a temporary restraining order

and a preliminary injunction and, after the Forest Service rescinded its decision, dismissed the case.

25.    On June 2, 2006, USFWS issued a Notice of Intent to prepare an Environmental Impact Statement ("EIS") under NEPA for the project and began conducting scoping.  USFWS did not mention CDFG or a joint EIS/EIR in its scoping notice.  After USFWS received scoping comments requesting a joint EIS/EIR with the Forest Service and CDFG, CDFG published a CEQA Notice of Preparation on September 16, 2008, more than two years after the initial scoping notice.

26.    On March 20, 2009, USFWS, the Forest Service (as a cooperating agency), and CDFG issued a draft Joint EIS/EIR.  Plaintiffs timely submitted comments on the draft Joint EIS/EIR, asserting among other things that it is deficient under NEPA and CEQA and portended a violation of substantive laws.

27.    On March 15, 2010, CDFG published and certified, with a statement of overriding considerations, a final Joint EIS/EIR.  On March 17, 2010, CDFG published its Notice of Determination.

28.    On April 10, 2010, USFWS published the same Final EIS/EIR, and notified the public that it would accept additional public comments for 30 days.

29.    On April 14, 2010, the Lahontan Board issued a National Pollutant Discharge Elimination System Permit ("NPDES permit") to CDFG to authorize discharges associated with the rotenone project.

30.    To meet the 30-day statute of limitations under California state law for challenging a decision under CEQA, on April 16, 2010, Plaintiffs filed a petition for writ of mandate in the Superior Court of California, County of Sacramento, to challenge CDFG's

decision.  Next, on May 14, 2010, Plaintiffs filed a petition for review to the State Board of the permit issued by the Lahontan Board to CDFG to authorize the discharges associated with the project.  Plaintiffs requested that the State Board stay the permit pending the appeal.  Plaintiffs alleged violations of the Clean Water Act and the Basin Plan.

31.    On May 20, 2010, USFWS issued a Record of Decision adopting the preferred alternative to poison Silver King Creek.  On May 20, 2010, the Forest Service issued a Record of Decision adopting the Final EIS/EIR and allowing USFWS and CDFG to apply rotenone (CFT Legumine formulation) in Silver King Creek, and to use a gasoline generator-powered auger within the Carson-Iceberg Wilderness in August and September of 2010.  The Forest Service did not waive the 15 person/25 stock group size limit for entry into wilderness in order to allow the 50 people required for the poisoning project.

32.    The Forest Service must approve use of pesticides on Forest Service lands.  It must also approve the use of motorized equipment in a designated wilderness. It must also approve a group size limit of more than 15 persons in the wilderness.  The Forest Service's ROD is subject to administrative appeal.  Plaintiffs intend to file an appeal of that decision and exhaust all administrative remedies.  All Forest Service projects subject to appeal must be stayed pending appeal and for 15 days after the Forest Service decides the appeal.  Pursuant to the administrative appeal timelines, the project will likely be stayed until September 4, 2010, even if the appeal is ultimately denied.

33.    This project cannot proceed without the approvals of USFWS and the Forest Service and a valid NPDES permit.

Final EIS/EIR

34.    The primary objective of the project is to establish Paiute cutthroat trout ("PCT") as the only salmonid fish species in Silver King Creek, in order to prevent the risk of hybridization of PCT above Llewellyn Falls.  The EIS/EIR describes the risk of hybridization as a "bucket biologist," someone who illegally transplants fish, taking a non-native fish from below Llewellyn Falls and moving it up to the area above the falls, which is inhabited by the pure strain of Paiute cutthroat trout.

35.    Secondary objectives include preventing extinction of PCT, avoiding genetic bottlenecking and stochastic events and facilitating the removal of the species from the federal threatened species list.

36.    The EIS/EIR considered a no action alternative and two action alternatives.  The No Action alternative evaluated continuing current management practices, but included a new commitment by the agencies to develop informational handouts to inform anglers of the risks associated with the Paiute cutthroat trout.  Under current management, agency personnel will have a presence along these creeks "as budgets allow."

37.    The Preferred Alternative is to poison an 11-mile stream reach on Silver King Creek, and its associated tributaries, seeps and springs, with a rotenone formulation up to two times a year for two to three years.  Rotenone is a piscicide that kills gill-breathing organisms including fish, amphibians and benthic macroinvertebrates including aquatic insects in their aquatic life stages.

38.    Another chemical, potassium permanganate, would be used to neutralize downstream the effects of rotenone, one of the chemicals in the formulation.  CFT Legumine, the rotenone formulation proposed for use, also contains other active ingredients and inert

ingredients that are potentially toxic.  The EIS/EIR states that inert ingredients are expected to persist in the water for up to two weeks.

39.    The Preferred Alternative would use generator-powered volumetric augers to administer the potassium permanganate to attempt to eliminate the toxic effects of rotenone downstream of the project area.

40.    Dead fish would be captured in nets downstream and buried in wilderness at sites chosen by the Forest Service.

41.    After poisoning for two to three years, the agencies would begin restocking Paiute cutthroat trout.

42.    The Preferred Alternative does not include poisoning Tamarack Lake, which was proposed for poisoning in the 2002 and 2004 versions of this same project and considered as a possible future action in the EIS/EIR.  Based on 2001-2009 fishery surveys, the lake is deemed fishless.  The same evidence of Tamarack Lake's fishlessness existed in 2004, but was disregarded in the prior project proposals, which all included lake poisoning.   The USFWS Recovery Plan for the Paiute cutthroat trout calls for the poisoning of Tamarack Lake.

43.    According to the EIS/EIR, the poisoning can only occur from mid-August to mid-September due to biological and physical constraints.

44.    There are contradictions between the NPDES permit and the EIS/EIR regarding the number of times poison will be used and formulations to be used. These contradictions have not been resolved.

45.    The third alternative includes the use of non-chemical means to remove non-native trout from the project area.  Electrofishing, gill netting, seining and other physical methods of removal would be used.  According to the EIR, this alternative would have lower

annual efficiency than poisoning, but could achieve the project's goal of removing non-native fish after at least 10 years of implementation.  There would be a small risk that small fish would remain uncaptured.

46.     The physical removal alternative would involve 72 days of work during the summer by a group of 11 people.  This number would be below the wilderness limit and not require a special Forest Service permit.

47.     The physical removal alternative would be implemented in late June or early July to mid-October because of access, streamflows and good weather.

<u>Impacts</u>

48.     The primary difference in the two action alternatives is that the preferred alternative involves poisoning and killing nearly everything in the treated stream system, including causing the potential extinction of other species, as rare and unique as PCT.  In terms of project success, the preferred alternative's primary advantage is that it could achieve its goals more quickly than the physical removal alternative and would cost less, but the costs to the ecosystem would be greater.  If the EIS/EIR had considered or disclosed the potential costs of lost species, biodiversity, species abundance and assemblages, human health risks and wilderness values, the true costs of the preferred alternative would greatly exceed the costs of the physical removal option.

49.     The EIS/EIR states that cost was not used to screen out any alternatives and was only used to compare options that were approximately equal in efficacy and impact, namely the two action alternatives.

50.     The EIS/EIR failed to consider other alternatives raised by the public, including prohibiting fishing in this area, providing greater ranger patrol and educating the public about the

danger of transplanting fish above Llewellyn Falls.  None of the alternatives address one of the primary purposes of the project, which is to prevent a "bucket biologist" from taking a hybridized or non-native fish from below Llewellyn Falls and transplanting it above the falls, thereby contaminating the pure PCT.  Even if the preferred alternative succeeded in expanding the habitat of a pure strain of PCT, there still remains the risk that a non-native fish could be planted in that habitat from just downstream where non-native trout are plentiful.  The EIS/EIR does not address that probability.

51.    The preferred alternative does not guarantee 100% success in removal of non-native or hybridized trout.  In fact, there is no evidence that over time, the physical removal methods (the third alternative) will not produce the same likelihood of success as repeated stream poisoning.

THE PROJECT'S PURPOSE IS UNACHIEVABLE

52.    In order to isolate the project area from non-native fish, the project depends upon alleged downstream impassable barriers.  In response to comments, the EIS/EIR concedes that it cannot definitively state that no rainbow trout could ever pass the project's downstream barriers. The EIS/EIR characterizes the possibility as "remote," but admits that under certain conditions, rainbow trout could migrate upstream.  The single report on which the EIS/EIR relies to assess this possibility was prepared by an hydraulic engineer for CDFG, who viewed the alleged barrier only under low flow conditions, and did not witness the multiple flow paths at high stream flow. Dr. Erman, a fisheries biologist, has commented to CDFG that the alleged barrier may not be impassable for rainbow trout.

53.    The agencies have failed to make the necessary physical measurements of the series of falls in the lower canyon to determine if it is a barrier to upstream fish migration.

Feasible scientific methods exist for making these measurements in such a way that allows for the agencies to determine whether this project can meet its purpose and objectives.

54.    In its Findings of Fact, CDFG incorrectly claimed that, "[t]hese barriers, the two highest being eight and ten feet high, would geographically isolate Paiute cutthroat trout from other trout species and greatly reduce the likelihood of an illegal introduction."  That result cannot be guaranteed because at least some fish may be able to migrate back upstream during high water.

55.    The EIS/EIR does not explain why there would be less risk of an illegal introduction of non-native trout further downstream, when the project area immediately abuts a stretch of stream with non-native trout, just below the alleged impassable barriers.  If concerns about illegal introductions above Llewellyn Falls are legitimate, then it is also likely that a bucket biologist will reinfect the project area with a non-native trout.

56.    The PCT exists in at least five secure populations within the Silver King Creek stream system.  The PCT exists in four other secure populations outside the Silver King Creek watershed. Expanding habitat for PCT in the project area will create yet another bottlenecked population and will not address the genetic diversity concerns raised by the agencies.

57.    USFWS has admitted that because this is a small, isolated species it will always be vulnerable to stochastic events, regardless of this project.

58.    The EIS/EIR disregards recommendations made by university geneticists, hired by CDFG, concerning reasons for genetically bottlenecked populations of PCT and regarding future management of the fish.

59.    The EIS/EIR contains no credible evidence that the area to be poisoned was the native habitat of the PCT. The only scientifically documented and published habitat for the PCT is above Llewellyn Falls.

CHEMICALS

60.    In 2009, the EPA banned the use of rotenone in marine and estuarine environments.  Rotenone is linked to Parkinson's disease in humans.  As a result, the use of rotenone on land or in agriculture has ceased and its manufacturers have not sought reregistration by EPA for rotenone's use on land.

61.    Potassium permanganate may not neutralize other chemicals or ingredients in the rotenone formulation.  It is also unknown whether potassium permanganate neutralizes the other active ingredients, unspecified cube resins that are present in CFT Legumine, the rotenone formulation to be used in the project.

62.    There are contradictions between the NPDES permit and the EIS/EIR regarding number of times poison will be used and formulations to be used.  These have not been resolved.

63.    The EIS/EIR failed to discuss or evaluate a number of the active ingredients in CFT Legumine, including cube resins. Cube resins, an active ingredient in CFT Legumine, have been disregarded in all government documents for this project, including the NPDES permit.

64.    The EIS/EIR fails to evaluate or base its findings on any sampling of sediments for piperonyl butoxide, an active ingredient in past rotenone projects in Silver King and known to persist in sediments.

65.    The FWS ROD disregards data analysis presented by independent scientists that showed that the agencies were unable to control application of CFT Legumine in the 2007 Lake Davis project, the only other project that has used the poison in California.

66.    The EIS/EIR does not fully disclose and evaluate the impacts of the incidence of unintended fish kills or persistence of toxic substances in the stream system, based on CDFG's prior record of rotenone projects.  During past rotenone projects, CDFG has failed to comply with other agencies' requirements, and its actions have resulted in fish kills downstream of these projects, and persistence of toxic substances in streams.

67.    During rotenone poisoning of Silver King Creek in Alpine County in 1992, more than 1000 fish were unintentionally killed downstream of the project area from the application of potassium permanganate.  The following year, 1993, during a repeat poisoning of the same area, detoxification of the rotenone was chemically incomplete.  The record shows that CDFG has difficulty managing the performance of potassium permanganate and detoxifying the rotenone.  Evidence from the 2007 Lake Davis poisoning demonstrates the inability of CDFG to properly apply rotenone according to label requirements and to meet their own target concentrations.

68.    In the Lahontan Region alone, 6 of 11 rotenone projects between 1988 and 1994 violated water quality standards.  Rotenone, rotenolone, or naphthalene were detected outside project boundaries or persisted longer than limits established by water quality standards.

69.    This project will complete the poisoning of almost the entire Silver King basin. The upper part above Llewellyn Falls has been poisoned numerous times.  Below Llewellyn Falls rotenone has never been purposely applied.  The side creeks below Llewellyn, other than Coyote and Corral Creeks, have not been poisoned.

SPECIES IMPACTS

70.    Nearly a decade after this project was first conceived, the USFWS and CDFG still have not conducted a macroinvertebrate species inventory in the project area and stream drainage to determine what non-target species find habitat in the area.

71.    The project has a high probability of affecting or eliminating endemic and rare, non-target species.  It is clear that the prior poisoning of the Silver King drainage caused long-term adverse effects to aquatic invertebrates.  The USFWS and CDFG admitted in response to comments in the Final EIS/EIR that impacts to aquatic invertebrates lasted at least three years after the final rotenone treatment within Silver King Creek basin in 1993.  As recently as 2003 and based on the same data, in a report to the Lahontan Board, CDFG denied that these impacts to aquatic invertebrates lasted at least three years.

72.    The NPDES permit adopted for the project concedes that the poisoning could result in the loss of species, of larger taxa (i.e., genus, family, order, which could include several/many species) and of species endemic to Silver King Creek.  The last time rotenone was used in this basin it caused long-term changes to species composition of invertebrate communities.

73.    The USFWS and CDFG have refused to do an inventory of invertebrate species prior to poisoning.  No species level inventory has yet been made of aquatic macroinvertebrates in Silver King Creek.  Thus, the only reason the EIS/EIR is unable to identify specific endemic invertebrates is because they have not been looked for.  The EIS/EIR concedes that the preferred alternative's poisoning could result in loss of rare or endemic species, which would be a significant and unavoidable impact.

74.    Studies show that rotenone causes significant, long-term effects on aquatic invertebrates.  As one example, a five-year study showed that up to 100 percent of mayflies, stoneflies and caddisflies were missing after a second rotenone application and that five years later, 21 percent of the taxa and 19 species were still missing.  Significant reduction in population levels of invertebrates and extirpation of certain species is a probable result of the

project. These waters will likely be recolonized by "weedy" species, i.e., those that disperse and colonize rapidly by flight and thrive in disturbed habitats.

75.    The USFWS ROD relies on reports that are not scientifically reliable and draw unsupportable conclusions. For example, the USFWS ROD relies on one study that drew incorrect conclusions about CFT Legumine from the data. The data in that paper do not show that CFT Legumine is less harmful to invertebrates than Nusyn Noxfish.

76.    The project includes post-poisoning monitoring of invertebrate populations, which will merely document further loss of unknown species in this watershed, but will do nothing to mitigate those losses.

77.    The invertebrate monitoring plan has deficient controls that will not fully reveal project impacts because the reference sites have all been poisoned at least one or several times in the past. Rotenone treatment of streams in this watershed also compromises the streams' use as reference sites upon which biological criteria may be based. Wilderness stream systems are the best source of establishing biological criteria for water quality because of their relative unaltered conditions. Poisoning these systems eliminates an important source of scientific baseline study.

78.    The EIS/EIR does not adequately assess the effect of the project on terrestrial and other species that rely on emerging aquatic insect adults as a food source. Fall is the time of year when new generations of most insect species are in the water. Most insects have a one-year life cycle. Three years of poisoning could reduce four years of insect generations of many species. The stream poisoning will significantly depress, or possibly completely eliminate, a critical food supply for non-target species for at least four years. Species such as the yellow warbler and the willow flycatcher, both designated forest sensitive species, will be significantly affected.

79.     Prior to poisoning, the agencies will survey for amphibians proposed for listing under the Endangered Species Act and if they are found, the agencies will remove them, to the extent practicable and relocate them in other waters within the drainage, but outside of the project area.

80.     The mountain yellow-legged frog and Yosemite Toad are found in the Silver King basin and would also be adversely affected by the poisoning.  The mountain yellow-legged frog spends up to four years as a tadpole and is highly aquatic compared to other amphibian species. There is no time during the year when tadpoles would not be in the stream system.  The mountain yellow-legged frog is warranted for listing as an endangered species and is classified as a sensitive species by the Forest Service.

81.     The USFWS ROD accepts and discusses the importance of global warming on fish species, but disregards its effect on invertebrate species.

FISH STOCKING AND RECREATIONAL ANGLING

82.     Effective May 21, 2009, the California Fish and Game Commission increased the daily bag limit for fish in the area to be poisoned in order to assist with pre-project fish removal. This regulation in support of the project was adopted 10 months prior to the completion of the final EIS/EIR.

83.     From 1930 through 1991, CDFG intentionally stocked on at least 92 occasions more than 200,000 fish representing six species, subspecies, or hybrids into Paiute cutthroat trout habitat in the Silver King Creek watershed.

84.     CDFG continues to stock non-native trout downstream of the project area.

85.     CDFG and USFWS's recent Fish Stocking and Hatchery EIR/EIS allows CDFG to continue stocking non-native fish in this watershed and stream system. Continued stocking of

fish in the East Fork Carson River and below the Silver King canyon by CDFG and private fish hatcheries (as sold to counties) will remain a threat to the Paiute CT.

86.    CDFG continues to encourage recreational fishing in the Silver King Creek watershed and promotes the Paiute cutthroat trout in its Heritage Trout Program. The Paiute CT habitat above Llewellyn Falls is closed to fishing except by invitation from CDFG.  CDFG has taken people fishing for Paiute CT above Llewellyn Falls to assess the potential for a Paiute CT fishery in Silver King Creek.

WILDERNESS VALUES

87.    Each year of the project, the poisoning effort will require up to 50 people and an undisclosed number of pack stock entering and sleeping in the wilderness.  In order to protect wilderness character, the Forest Service limits wilderness access at any one time to 15 people.

88.    The poisoning project would alter the natural conditions of the Silver King Creek watershed and result in 1) the loss of native species, 2) the loss of non-target species, 3) the alteration of terrestrial and aquatic food webs, and 4) indelible changes to the community composition and species assemblage in the Silver King Creek.

89.    The project also results in motorized uses in wilderness and closure of a drinking supply for wilderness users.

**FIRST CAUSE OF ACTION:**

**Violations of NEPA.**

NEPA: Failure to Adequately Evaluate Alternatives

90.    Plaintiffs hereby reallege and incorporate the preceding paragraphs.

91.    NEPA requires that agencies "rigorously explore and objectively evaluate all reasonable alternatives" to the proposed action. 42 U.S.C. § 4332(2)(C)(iii); 40 C.F.R. §

1502.14.  Agencies must, "study, develop and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."  42 U.S.C. § 4332(2)(E); 40 C.F.R. §§ 1501.2(c), 1507.2.

92.    Impacts of reasonable alternatives should be presented in comparative form, "thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public."  40 C.F.R. § 1502.14.

93.    The EIS/EIR does not adequately consider or evaluate an alternative that would have minimized adverse impacts or enhanced the quality of the human environment and still satisfied the purpose and need for the project.  *See* 40 C.F.R. § 1502.1.  USFWS and CDFG included a non-chemical removal alternative, but did not include other measures that would have strengthened that alternative, such as closing the area to fishing, providing regular ranger patrols to monitor for illegal fish planting and eliminating stocking of non-native fish downstream of the project area.

94.    The EIS/EIR's stated purpose and need for the poisoning project is not realistic given that the EIS/EIR do not show that 1) the project is necessary for the recovery or survival of Paiute Cutthroat Trout in its historic habitat, 2) the project is not guaranteed to succeed because the potential exists for downstream non-native fish to migrate upstream to the project area; and 3) the potential exists for a bucket biologist to reinfect the project area with non-native trout.

95.    The EIS/EIR fails to properly evaluate the alternatives to the proposed action, because its analysis assumed that the preferred alternative would be successful, when the evidence indicates that non-native fish will still swim upstream of the alleged barriers.

NEPA: Failure to Disclose Potentially Significant and Cumulative Impacts

96.    Plaintiffs hereby reallege and incorporate the preceding paragraphs.

97.    NEPA requires that agencies discuss "any adverse environmental effects which cannot be avoided should the proposal be implemented."  40 C.F.R. § 1502.16; *see also* 40 C.F.R. §§ 1508.7, 1508.8.  The EIS must also disclose and analyze conflicting scientific data and responsible opposing views. 40 C.F.R. § 1502.9(b).

98.    NEPA requires that an EIS consider the cumulative impacts of the proposed action together with past, present and reasonably foreseeable future actions, including all federal and non-federal activities.  "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time."  40 C.F.R. § 1508.7.

99.    The EIS/EIR fails to consider potentially significant impacts.  USFWS did not discuss the effects of cube resins, an active ingredient in CFT Legumine that can interfere with mitochondrial functioning, on the Silver King Creek ecosystem.  Cube resins would not be monitored as part of the poisoning project.

100.    The EIS/EIR does not adequately discuss the effect of inert ingredients.

101.    The EIS/EIR does not adequately discuss the possibility that poisoning will remain in aquatic sediments after the project and will not analyze water or sediments for low-level pesticide residue prior to applying piscicides.

102.    The EIS/EIR incorrectly states that the poisoning project will have only "in stream" impacts, but emerging adult insects are a source of food for many terrestrial insects, spiders, birds, amphibians, reptiles, and mammals including bats.  The loss of emerging insects for several years would be a major impact to riparian animals.

103.    The EIS/EIR does not adequately discuss data presented to them by scientists that showed that the agencies were unable to control application of CFT Legumine in the 2007 Lake Davis project, the only other project that has used the poison in California.

104.    The EIS/EIR does not adequately address the high probability that the project will violate water quality standards and result in unintended fish kills, as evidenced by the history of agency failures in the region.  During a 6 year period, 54% of rotenone poisoning projects in the Lahontan region violated water quality standards.  Past rotenone poisoning of Silver King Creek in 1992 resulted in more than 1000 unintended fish kills the following year and during a repeat poisoning of the same area, detoxification of the rotenone was chemically incomplete.

105.    The EIS/EIR fails to properly analyze and disclose the cumulative effects of the project on the Silver King Creek watershed.  The poisoning will result in loss of rare or endemic species.

106.    The EIS/EIR fails to properly analyze and disclose the potentially significant cumulative effects of the project on the Silver King Creek watershed and ecosystem.  Because poisoning will result in the near complete poisoning of the Silver King Creek drainage, the project compromises the stream's use as a reference site upon which biological criteria may be based.  Wilderness stream systems are the best source of establishing biological criteria for water quality because of their relative unaltered conditions.  The EIS/EIR fails to address the fact that poisoning these systems eliminates an important reference site in the watershed.

NEPA: Failure to Ensure the Scientific Accuracy of Relied Upon Information

107.    Plaintiffs hereby reallege and incorporate the preceding paragraphs.

108.    NEPA's implementing regulations require agencies to ensure the scientific accuracy of information it relies upon in making conclusions and to make explicit reference by footnote to those sources.  40 C.F.R. § 1502.24.  An EIS/EIR must rely upon high quality and accurate data. 40 C.F.R. § 1500.1(b).  When a cost-benefit analysis is provided, it must not be biased, conclusory or misleading.  40 C.F.R. § 1502.23.

109.     The EIS/EIR rely on data that is inaccurate and of a poor quality.   Among other things, the EIS/EIR supports the USFWS ROD, which relies on one study and drew incorrect conclusions about the effects of CFT Legumine. Data in the source relied upon do not show that CFT Legumine is less harmful to invertebrates than Nusyn Noxfish.

110.     USFWS's conclusions and ultimate decisions in the ROD were based on inaccurate information.

NEPA: <u>Failure to Provide Adequate Responses to Comments</u>

111.     Plaintiffs hereby reallege and incorporate the preceding paragraphs.

112.     The EIS/EIR must include substantive responses to comments both individually and collectively.  40 C.F.R. § 1503.4.  USFWS must respond: (1) by modifying alternatives, including the proposed action; (2) by developing and evaluating alternatives not previously considered by the agency; (3) supplement, improve, or modify its analysis; or (4) make factual corrections.  If the agency believes that no further response is necessary, it must "explain why the comments do not warrant further agency response, citing the sources, authorities, or reasons which support the agency's position . . . ."  40 C.F.R. § 1503.4(a)(1-5).

113.     The EIS/EIR failed to adequately respond to comments and to opposing expert viewpoints on a range of issues set forth above.

<strong><u>SECOND CAUSE OF ACTION:</u></strong>

<u>Violations of the Wilderness Act</u>

114.     Plaintiffs hereby reallege and incorporate the preceding paragraphs.

115.     The Wilderness Act requires the Carson-Iceberg Wilderness of the Humboldt-Toiyabe National Forest in California area to be managed to preserve its wilderness character. 16 U.S.C. § 1133(b). The Wilderness Act defines wilderness to mean "an area of undeveloped

COMPLAINT                                                                                          -26-

Federal land retaining its primitive character and influence, without permanent improvements or human habitation, which is protected and managed so as to preserve its natural conditions," and "where the earth and its community of life are untrammeled by man." 16 U.S.C. § 1131(c). Among other things, the extent, location, amount, and intensity of authorized rotenone use will impermissibly and permanently harm wilderness character, and impermissibly alter natural conditions in wilderness.

### THIRD CAUSE OF ACTION:

Violations of the Endangered Species Act

116.     Plaintiffs hereby reallege and incorporate the preceding paragraphs.

117.     The Endangered Species Act ("ESA") requires the USFWS to develop and implement a recovery plan for "the conservation and survival" of PCT.  16 U.S.C. § 1533(f)(1). The ESA provides that the recovery plan shall, to the maximum extent practicable, describe site-specific actions that are necessary to achieve the plan's goal to conserve the species.  16 U.S.C. § 1533(f)(1)(B)(i)-(iii).  The recovery plan must also, among other things, include objective criteria that, when met, would result in a determination that the species be removed from the ESA list.  16 U.S.C. § 1533(f)(1)(B)(ii).  USFWS relies on its recovery plan for the PCT as a planning basis for the poisoning of Silver King Creek.

118.     The recovery plan is arbitrary and capricious in part because it is uncertain whether the section of Silver King Creek to be poisoned constitutes historic habitat for the PCT. The recovery plan is also arbitrary and capricious because extirpating aquatic life in this section of the creek in order to replant the PCT will not guarantee its isolation, because rainbow trout may continue to migrate into the section from downstream locations or be planted there illegally.

## FOURTH CAUSE OF ACTION:

### Violations of the Clean Water Act

119.    Plaintiffs hereby reallege and incorporate the preceding paragraphs.

120.    The project will result in a violation of the Water Quality Control Plan for the Lahontan Region (Basin Plan), and thus, the Federal Water Pollution Control Act (the "Clean Water Act" or "CWA"), 33 U.S.C. §§ 1251 et seq., and the Porter-Cologne Water Quality Control Act  ("Porter-Cologne Act"), Water Code §§ 13000 et seq.  Both water quality standards and the antidegradation standard will be violated.

## FIFTH CAUSE OF ACTION:

### Violations of CEQA

121.    Plaintiffs hereby reallege and incorporate the preceding paragraphs.

122.    CEQA requires, among other things, that an EIR properly describe the objectives, purposes, and need for the EIR (tit. 14, Cal. Code of Regs., § 15124);  properly describe  the environmental baseline against which to evaluate impacts of the poisoning project in a meaningful context (tit. 14, Cal.Code of Regs., §§ 15125, 15360); consider and evaluate a reasonable range of alternatives (Pub. Res. Code § 21100 & tit. 14, Cal.Code of Regs., § 15126.6);  adequately consider, analyze, and disclose the direct, indirect, and cumulative impacts of the program (Pub. Res. Code § 21100 & tit. 14, Cal. Code of Regs., §§ 15126, 15126.2, 15143); and that the agency adopt specific reasonable mitigation measures or feasible alternatives for the significant adverse impacts of the project or program (Pub. Res. Code § 21100 & tit. 14, Cal. Code of Regs., § 15126).  An agency's decision, its statement of overriding considerations and findings must be supported by substantial evidence.  Pub. Res. Code §21168.5 & Code of Civil Procedure §1094.5.

123.    CDFG prejudicially abused its discretion and failed to proceed according to law by certifying and approving the Paiute Cutthroat Restoration Project EIS/EIR, which violates CEQA, among other laws, because it (i) improperly narrowed the objectives, purposes, and need for the project, (ii) used an improper environmental baseline against which to evaluate impacts of the project in a meaningful context, (iii) failed to consider and evaluate a reasonable range of alternative actions, (iv) failed to adequately consider, analyze, and disclose the direct, indirect, and cumulative impacts of the project, (v) failed to adopt feasible alternatives or specific reasonable mitigation measure for the significant adverse impacts of the project, (vi) disregarded the best available science in evaluating impacts in the EIS/EIR, and (vii) failed to support its decision with substantial evidence in the record. CDFG's actions in completing, approving, and certifying the EIS/EIR violates its duties under CEQA, among other things, and constitutes a prejudicial abuse of discretion that is actionable under Pub. Res. Code § 21168.5 and Civ. Pro. Code § 1094.5.

124.    CDFG prejudicially abused its discretion and failed to proceed according to law because the conclusions, findings and statement of overriding considerations in and for the EIR/EIS, which Petitioners challenge, are not supported by substantial evidence in the record.

## SIXTH CAUSE OF ACTION:

### Violations of the Administrative Procedure Act

125.    Plaintiffs hereby reallege and incorporate the preceding paragraphs.

126.    The Administrative Procedure Act, 5 U.S.C. § 701 et seq., entitles a party to seek judicial review of an agency action where a legal wrong is alleged and the party alleging the violation is adversely affected or aggrieved by the agency action.  Pursuant to 5 U.S.C. § 706, a reviewing court shall hold unlawful and set aside agency action found to be arbitrary, capricious,

or otherwise not in accordance with the law, and should compel agency action illegally withheld or unreasonably delayed.  The USFWS ROD and EIS/EIR constitutes arbitrary and capricious agency action, is an abuse of discretion, and is contrary to law and to procedures required by law. 5 U.S.C. § 706(2)(A), (D).

<u>RELIEF REQUESTED</u>

Plaintiffs respectfully request that the Court:

1.    Declare that the EIS/EIR violates NEPA and CEQA as alleged;

2.    Declare that the EIS/EIR and decision documents violate NEPA, the Wilderness Act, the Clean Water Act and Porter Cologne Act, as alleged;

3.    Set aside and vacate the EIS/EIR and decision documents implementing it;

4.    Enjoin the use of rotenone in Silver King Creek;

5.    Grant Plaintiffs their attorneys' fees and costs and expenses of this suit

6.    Grant such other relief as the Court deems appropriate or necessary.

Dated: June 15, 2010                    Respectfully submitted,

                                        /s/ Julia A. Olson
                                        Julia A. Olson
                                        jaoearth@aol.com

                                        Peter M.K. Frost
                                        frost@westernlaw.org

                                        Sharon E. Duggan
                                        foxsduggan@aol.com

                                        Counsel for Plaintiffs
                                        Californians for Alternatives to Toxics,
                                        Wilderness Watch, Friends of Silver King
                                        Creek, Laurel Ames, Ann McCampbell,
                                        MD.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28