1

2

3

4

5

6

7

8

9

10

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

11

12   CALIFORNIANS FOR ALTERNATIVES
     TO TOXICS, a non-profit10/21

13   corporation; WILDERNESS WATCH,
     a non-profit corporation; THE

14   FRIENDS OF SILVER KING CREEK,
     a California non-profit

15   corporation; LAUREL AMES, an
     individual and ANN MCCAMPBELL,
     an individual,

16                                          NO. CIV. S-10-1477 FCD/CMK

17            Plaintiffs,

18        v.                                MEMORANDUM AND ORDER

19   UNITED STATES FISH AND
     WILDLIFE SERVICE; ALEXANDRA

20   PITTS, in her official
     capacity; UNITED STATES FOREST

21   SERVICE; JEANNE M. HIGGINS, in
     her official capacity,

22            Defendants.

23                           ----oo0oo----

24        This matter is before the court on the parties' cross-

25   motions for summary judgment in this environmental case in which

26

27

28

                                    1

plaintiffs[1] seek to set aside the EIR/EIS[2] and the agencies' decisions authorizing the Paiute Cutthroat Trout Restoration Project (the "Project") in Silver King Creek, located in the Carson-Iceberg Wilderness in Alpine County, California.  The Project will restore the Paiute cutthroat trout ("PCT") to its historic range in Silver King Creek by eradicating non-native trout between Llewellyn Falls and Silver King Canyon with the pesticide rotenone and restocking the treated area with pure PCT from donor streams.  According to defendants, the Project is a critical and necessary step towards removing the PCT from the Endangered Species Act's threatened species list and preventing its extinction.

By their complaint, filed June 15, 2010, plaintiffs challenge the EIR/EIS, jointly prepared by the United States Fish and Wildlife Service ("USFWS") and the California Department of Fish and Game ("CDFG"), to authorize the Project under the National Environmental Policy Act ("NEPA"), the Wilderness Act of 1964 (the "Wilderness Act"), the Endangered Species Act ("ESA"),

---

[1]    Named as plaintiffs are three organizations and two individuals.  Only Laurel Ames, the founding member of plaintiff Friends of Silver King Creek, filed a declaration in support of the motion, establishing a basis for granting injunctive relief in this case.  As such, defendants have properly sought dismissal of the other named plaintiffs as there has been no showing of an injury to the entities (Californians for Alternatives to Toxics and Wilderness Watch) or the other individual (McCampbell).  Plaintiff's counsel requested leave at the oral argument to supplement the record to submit declarations on behalf of these plaintiffs, but the court denied the request considering the late stage of the case and motion and finding that Ames' declaration was sufficient to warrant granting relief in plaintiffs' favor.

[2]    "EIR/EIS" denotes the Enviornmental Impact Report/Environmental Impact Statement jointly prepared in this case by the United States Fish and Wildlife Service and the California Department of Fish and Game.

the Federal Water Pollution Control Act ("Clean Water Act"), the California Environmental Quality Act ("CEQA") and the Administrative Procedures Act ("APA").

Plaintiffs filed their motion for summary judgment on April 3, 2011, seeking partial summary judgment in their favor on their NEPA and Wilderness Act claims.  On May 5, 2011, USFWS and the United States Forest Service ("USFS") filed an opposition and cross-motion for summary judgment on plaintiffs' other claims for relief under the ESA, Clean Water Act and APA.[3]  The court heard oral argument on the motions on August 11, 2011, and by this order now renders its decision on the motions.

Plaintiffs' motion is GRANTED in part and denied in part. Plaintiffs have not demonstrated a violation of NEPA and therefore, their motion on that claim is DENIED.  However, plaintiffs have shown a violation of the Wilderness Act because in choosing one competing value (the conservation of the PCT) over another value (preservation of the wilderness character), the agencies left native invertebrate species out of the balance, and thus improperly concluded that authorization of motorized equipment will comply with the Act by achieving the purpose of

---

[3]     Plaintiffs agreed to dismiss their ESA and Clean Water Act claims.  (Pls.' Opp'n to Defs.' Mot. for Summ. J. [Docket #57], filed May 19, 2011, at 25:14-16 [requesting dismissal of their Clean Water Act claim]; plaintiffs did not respond to defendants' motion as to their ESA claim and confirmed at oral argument that they request dismissal of that claim.) The APA provides the standard of review for plaintiffs' NEPA and Wilderness Act claims, and thus, it is redundant of those claims and does not need to be considered separately.  Plaintiffs' CEQA claim was previously dismissed as barred by the doctrine of sovereign immunity.  (Mem. & Order [Docket #23], filed Oct. 29, 2010.)

3

preserving wilderness character.

Having shown success on the merits of their Wilderness Act claim, plaintiffs are entitled to a permanent injunction, enjoining implementation of the Project because:  (1) through the expert declaration of Nancy Erman, they have demonstrated that the rotenone treatment will kill sensitive macroinvertebrate species and that recolonization will not occur for some species because they cannot adapt to the Project area habitat; and (2) the balance of equities tips in their favor as no exigency exists to begin the Project now; and (3) the public interest favors preservation of the unimpaired wilderness.

Defendants' cross-motion is accordingly DENIED in part and GRANTED in part.  Their motion is denied as to plaintiffs' Wilderness Act claim but granted with respect to plaintiffs' NEPA, ESA and Clean Water Act claims.

///

///

///

4

1

BACKGROUND[4]

2      The USFWS, the CDFG and the USFS (sometimes collectively,

3 the "Agencies") have proposed the Paiute Cutthroat Trout

4 Restoration Project to poison with rotenone[5] eleven miles of

5 Silver King Creek and then stock this area with pure PCT from

6 established populations in the upper portions of the watershed.

7 (UF #125.)  Silver King Creek is within the Carson-Iceberg

8 Wilderness of the Humboldt-Toiyabe National Forest in

9 California's Sierra Nevada Mountains.  (UF #11.)  The eleven-mile

10 project area includes a six-mile stretch of the mainstem of the

11 river downstream of Llewellyn Falls to Silver King Canyon,

12 sometimes referred to as lower Silver King Creek, and five miles

13 of tributaries.  (UF #84.)  Currently six populations of PCT

14 inhabit eleven and one-half miles of Silver King Creek, including

15

16      [4]   The background section will reference facts from three
17 sources.   Where facts are undisputed, the court will reference
Defendants' Response to Plaintiffs' Statement of Disputed and
18 Undisputed Facts [hereinafter "UF"]. (Docket #54-1, filed May 2,
2011.)  Where facts are disputed, the court will reference one of
19 two sources.   The first, titled Administrative Record
[hereinafter "AR"], contains documents from the USFWS.  (Notice
20 of Filing of the USFWS's Revised Administrative R. [Docket #40],
filed Feb. 23, 2011; Notice of Filing of the USFWS's Supplemental
21 Administrative R. [Docket #33], filed Jan. 20, 2011.)   The
second, titled Forest Service Administrative Record [hereinafter
22 "FS"], contains documents provided by the USFS.  (Notice of
Filing of the USFS's Administrative R. [Docket #26], filed Nov.
23 5, 2010; Notice of Filing of the USFS's Supplement to its
Administrative R. [Docket #32], filed Jan. 19, 2011.)   Unless
24 otherwise noted herein, where defendants dispute plaintiffs'
characterization of a fact, the court has referenced the record,
25 found plaintiffs' representation to be accurate, and therefore
considers the fact undisputed.

26      [5]   Rotenone kills gill breathing organisms, including
27 aquatic insects, other aquatic invertebrates, and amphibians. (UF
#95.)   The United States Environmental Protection Agency ("EPA")
28 has recognized that rotenone disrupts aquatic food chains even
where approved for use.  (UF #99.)

above Llewellyn Falls.  (UF #33.)

Originally, the USFWS and CDFG planned to begin project implementation in the late summer or early fall of 2011; however, due to record snowfall this winter, the Agencies recently announced that they will postpone implementation of the Project until the late summer or early Fall of 2012.  (UF #126.)  The Agencies propose to apply rotenone over two to three years.  (UF #91.)  Each application of rotenone would require seven working days and could be done twice a year.  (UF #87.)  An auger, powered by a gasoline-powered generator, will distribute potassium permanganate that will neutralize the toxicity of the rotenone downstream.[6]  (UF #100.)  Last, the Agencies propose to stock the project area with PCT the summer after the final poisoning, and continue annually until the population has reached the target size.[7]  (UF #124.)

The objective of the Project is to eradicate non-native fish in the proposed area and establish PCT as the only salmonid fish species in the Silver King Creek system--an action proposed[8] in the 2004 Revised Recovery Plan (the "2004 Plan") to prevent extinction of the PCT, as required by the ESA.  (AR 182.)  The PCT

---

[6]    Although potassium permanganate is also toxic to gill breathing organisms at the rate proposed in this project, the NPDES permit for the Project requires the Agencies to use potassium permanganate for neutralizing the rotenone.  (UF #s 100, 103.)

[7]    The preliminary target size is 2,500 individuals, greater than seventy-five millimeters in length, based on the 2004 Revised Recovery Plan, but is subject to change.  (FS 204.)

[8]    This action first appeared as a CDFG proposal in 2002, in part, to open up lower Silver King Creek to fishing.  (UF #57.)

is native to only Silver King Creek and is listed under the ESA as threatened with extinction.  (AR 180, 33235.)  The initial Recovery Plan, issued in 1985 (the "1985 Plan"), did not propose to establish PCT in Silver King Creek below Llewellyn Falls or to poison that stretch of the creek.  (UF #56.)  Instead, the 1985 Plan concluded that the PCT could be considered recovered "when a pure population of PCT has been reestablished in Silver King Creek *above* Llewellyn Falls, and the integrity of the habitats in Silver King Creek, Cottonwood Creek, and Stairway Creek has been secured and maintained over a consecutive five-year period with stable or increasing overwintering[9] populations of 500 or more adult fish in each of these streams."[10]   (UF #54.)

Under the 2004 Plan, the PCT would have to be successfully reintroduced into Silver King Creek from Llewellyn Falls downstream to Silver King Canyon to avoid extinction.  (AR 33237.) The USFWS stated reasons for the change from the 1985 Plan, including "1) the discovery of fish barriers downstream of Llewellyn Falls that would enable the expansion of Paiute cutthroat trout into historic habitat, 2) elimination and reduction of threats to existing populations, [and] 3) increased knowledge about Paiute cutthroat trout population dynamics based on long-term trend data."  (UF #61.)  According to this plan, the PCT listing for recovery under the ESA indicates a "moderate

---

[9]     "During the winter months, trout move into pools to avoid physical damage from ice scouring and to conserve energy.  As with other salmonids, suitable winter habitat may be more restrictive than summer habitat." (AR 33245.)

[10]     Only parts of this recovery criteria have been met. (UF #55.)

degree of threat for extinction." (UF #62.)   The 2004 Plan

concludes, however, that if the PCT remain only in their currently

occupied habitat, they will be "highly vulnerable to extinction."

(AR 33238.)

In 2004, the USFS ratified a Finding of No Significant Impact

("FONSI") under NEPA for an earlier iteration[11] of the project at

issue in this case.   Some of the plaintiffs in this case

challenged the FONSI for failing to comply with NEPA, and this

court ordered a preliminary injunction enjoining implementation of

the project; specifically, any application of rotenone

formulations and potassium permanganate to Silver King Creek, its

tributaries and backwaters, and Tamarack Lake.   (UF #76.)   The

court found that the plaintiffs made a strong showing of the

likelihood of irreparable harm to native Silver King Creek species

and the balance of interests tipped decisively in the plaintiffs'

favor.   <u>Californians for Alternatives to Toxics v. Troyer</u>, No.

CIV-05-633-FCD-KJM, 2005 WL 2105343, at *2 (E.D. Cal. Aug. 31,

2005).

Thereafter, in 2010, the Agencies published the EIR/EIS for

the Project at issue in this case.[12]   (UF #83.)   The EIR/EIS

analyzes three alternatives: the No Action Alternative

("Alternative One"); the Proposed Action Alternative ("Alternative

Two"); and the Combined Physical Removal Alternative ("Alternative

---

[11]   The only differences from the current proposal were (1)
the former title was Paiute Cutthroat Trout Recovery Project, and
(2) the project area included Tamarack Lake.   (AR 6118-19.)

[12]   Plaintiffs submitted timely comments on the draft and
final EIR/EIS, including scientific comments from specialists in
the fields of aquatic ecology and freshwater invertebrates.   (AR
37.)

Three").  (AR 177.)  Alternative One continues current management
of existing PCT populations in Silver King Creek, without
introducing new populations or efforts to eradicate non-native
trout; the EIR/EIS concluded that this alternative would not
result in direct environmental benefits.  (AR 193.)

Alternative Two analyzes the Project at issue here.  The
analysis acknowledges that this alternative could result in loss
of individual macroinvertebrate taxa, potentially including rare
or as yet unidentified species endemic to Silver King Creek.[13]  (UF
#115.)  While common macroinvertebrate taxa would recolonize the
Project areas, rarer taxa may be eradicated for a number of years
or indefinitely.  (UF #114.)  There is no information about the
existence of rare or endemic macroinvertebrate species in Silver
King Creek because current studies do not provide the level of
taxonomic resolution needed to detect rare or endemic species.
(UF #118.)[14]  The Agencies conclude in the EIR/EIS that performing
species studies to determine whether endemic or rare taxa exist in
Silver King Creek would require an intensive effort that would be
costly, might be inconclusive, may be technically infeasible, and

---

[13]    Plaintiffs maintain the EIR/EIS concluded that
Alternative Two would kill sensitive species (stoneflies,
caddisflies, mayflies) that are abundant in Silver King Creek.
(UF #110.)  Defendants dispute this fact, asserting that
plaintiffs mischaracterize the EIR/EIS which found only that
rotenone will have a *stronger effect* on these small, gilled taxa.
(Id.)

[14]    Defendants dispute this fact, asserting that the
Agencies analyzed the risk to rare or endemic species and will
take steps to minimize risks to these species from the Project.
(UF #118.)  However, those assertions do not defeat the Agencies'
acknowledgment that neither their own surveys, nor any others,
have determined whether or not rare or endemic species exist in
the Project area. (AR 247-48.)

is beyond the scope of the proposed action.[15]   (UF #s 143-144.)

     Alternative Three proposes using non-chemical techniques (a combination of electrofishing, gill netting, seining, and other physical methods) to remove non-native trout from the Project area.  (AR 204.)   The electrofishing component is estimated to take 580 hours, over a period of ten years, before completion, and the electrofishing batteries would be recharged with small gasoline-powered generators.[16]   (AR 205.)

     On May 20, 2010, both the USFS and the USFWS issued Records of Decision ("ROD") adopting Alternative Two, the Proposed Action Alternative.  (UF #83.)   The Forest Supervisor explained that she chose Alternative Two over Alternative Three because the CDFG and the USFWS had determined that the application of rotenone to Silver King Creek was "the most effective method to remove non-native trout within PCT historic habitat."  (FS 5156.)   As the representative of the agency mandated to manage lands protected under the Wilderness Act, the Forest Supervisor concluded that "the short term negative effects to the 'natural' Wilderness character through introduction of a chemical pesticide were balanced by the improved long term natural conditions of Wilderness character through restoration of a native species."

─────────────

[15]   The Agencies assert that community-level monitoring will suffice to assess the impact of rotenone on macroinvertebrate species in the watershed.  (AR 248, 270.)

[16]   In the Minimum Requirements Decision Guide, prepared by the USFS to evaluate the Project under the Wilderness Act, they analyzed an alternative that was similar to Alternative Three from the EIR/EIS, except that it proposed using packstock instead of gasoline-powered generators to re-supply batteries for electrofishing.  (FS 5062.)   The EIR/EIS did not include this alternative.

(FS 5157.)

On June 15, 2010, plaintiffs filed this case.  By their instant motion for summary judgment, plaintiffs seek an order for declaratory and injunctive relief.  Specifically, plaintiffs ask the court to find a violation of NEPA and/or the Wilderness Act and enjoin implementation of the Proposed Action Alternative under the EIR/EIS.  Defendants oppose plaintiffs' motion and cross-move for summary judgment.

More specifically, in their motion, plaintiffs move for summary adjudication on their NEPA claim on the following grounds: defendants' (1) failure to perform feasible studies to consider environmental effects, (2) reliance on faulty information in choosing the Proposed Action Alternative, (3) failure to use accurate scientific data in the 2004 Plan, and (4) failure to consider and disclose effects from the poisons in the EIR/EIS. Plaintiffs also move for summary adjudication on their Wilderness Act claim, arguing that the Project fails to comply with the Act's mandates. (Pls.' Mot. For Summ. J. and Injunctive Relief [Docket #48-1], filed April 11, 2011, at 11-26.)

In support of their first claim that the Agencies violated NEPA by failing to perform feasible studies, plaintiffs provide evidence that species-level studies of macroinvertebrates have been conducted for aquatic insects.  In fact, endemic species of aquatic invertebrates, including stoneflies and caddisflies have been identified through species surveys in other locations in the Sierra Nevada Mountains.  (UF #146.)  According to plaintiffs, the absence of species studies for the Project area results in a violation because NEPA regulations state that when information

11

relevant to a reasonably foreseeable significant impact is incomplete, the agency shall include complete information in the EIS.   40 C.F.R. § 1502.22(a).   One of plaintiff's experts, Nancy A. Erman, declares that a reasonable inventory of macroinvertebrate species in the Silver King Creek watershed could be feasibly conducted in two to three years.[17]   (Decl. of Nancy A. Erman in Support of the Pls.' Mot. For Summ. J. and Injunctive Relief [Docket #57-1], filed May, 19, 2011, at 3:7-8.)[18]

---

[17]   Alternatively, Mark Vinson, hired as a macroinvertebrate expert in the development of the EIR/EIS for this Project, suggested that a four-year post-doctorate project might be a reasonable way to "establish a good list of the aquatic insects in the stream."   (UF #145.)

[18]   Plaintiffs seek to supplement the record with the expert declarations of Nancy Erman (addressing the feasibility of conducting a species-level study of aquatic invertebrates in the Silver King Creek watershed) (Docket #57-1) and Dr. Don C. Erman (addressing barriers to upstream fish migration) (Docket #46). Typically, "[j]udicial review of an agency decision . . . focuses on the administrative record in existence at the time of the decision and does not encompass any part of the record that is made initially in the reviewing court." Southwest Ctr. for Biological Diversity v. U.S. Forest Serv., 100 F.3d 1443, 1450 (9th Cir. 1996).   However, the Ninth Circuit has recognized certain, narrow circumstances where supplementation of an administrative record may be justified, including where it is necessary to explain or clarify "technical terms or complex subject matter" involved in the agency action.   Southwest Center for Biological Diversity v. U.S. Forest Serv., 100 F.3d 1443, 1450 (9th Cir. 1996).   Here, Nancy Erman's and Don Erman's declarations address technical matters important to the resolution of this case; at bottom, the declarations help summarize for the court complex topics that were the subjects of many comment letters, the EIR/EIS and other record documents, and thus, the court grants plaintiffs' request to supplement the record.

   Also regarding the record, defendants ask the court to strike the excerpts of record plaintiffs submitted on paper (Docket #58) in conjunction with their motion because plaintiffs did not serve a copy on defendants and because the court's review is limited to the administrative record compiled by the Agencies. Defendants' motion to strike is properly granted as the court need not consider plaintiffs' excerpts of record as it has the full administrative record provided by the Agencies.

In response, defendants argue that they have met their burden under NEPA by (1) considering the effects of the Proposed Action Alternative on benthic macroinvertebrates based on the current state of scientific knowledge, (2) disclosing the possibility of loss of individual macroinvertebrate taxa, and (3) providing a thorough explanation of why a species-level study is not feasible. (USFWS and USFS's Opp'n to Pls.' MSJ [Docket #54], filed May 2, 2011, 21:26-22:3.)  Defendants claim that plaintiffs have not cited authority to show that NEPA requires the Agencies to conduct a study to rule out the possibility that rare and endemic species may exist in the Project area.  (<u>Id.</u> at 19:25 to 20:2.)  Instead, defendants assert that it would be inappropriate to place such a burden on federal agencies where "(1) no federally endangered, threatened, sensitive, or candidate macroinvertebrate species are known to exist in the Silver King Creek Basin; (2) the [A]gencies' experts explained that the likelihood of finding rare and endemic mancroinvertebrates in Silver King Creek is low . . . ;[19] and (3) the agencies explained that untreated upstream areas would enhance recolonization of macroinvertebrates [in the Project area after poisoning]."  (<u>Id.</u> at 20:9-16.)

According to defendants, a species inventory is infeasible because: (1) due to the lack of existing inventory data, a

---

[19]     Plaintiffs' expert, Nancy A. Erman, attests that defendants are incorrect that springs and seeps can serve as macroinvertebrate refugia for post-project re-colonization. (Decl. Nancy A. Erman, 7:4-5.)  Instead, she claims that many species found in springs and seeps do not live farther downstream in the watershed.  (<u>Id.</u> at 7:7-8.)  Because springs maintain constant or near-constant temperatures, spring species cannot live farther downstream when temperatures are variable.  (<u>Id.</u> at 7:10-12.)

complete inventory of aquatic invertebrates would be necessary, requiring an intensive effort beyond the scope of the Project; (2) the state of the art of benthic invertebrate taxonomy is not sufficiently advanced to allow identification to the species level; (3) an inventory would require sampling at multiple stations over different seasons and across multiple years; and (4) even a complete species inventory may not determine if a species, which is absent after a rotenone treatment, was actually absent or whether it was missing during the sampling.  (Id. at 20:17-21-27.)

Also under their first NEPA claim, plaintiffs assert that defendants only presume that there is a natural barrier downstream of the Project area, because all the data was collected in autumn when flows in Silver King Creek were minimal and the efficacy of any barriers was optimal.  In support of this assertion, plaintiffs' expert, Don C. Erman, attests that scientific judgment of potential barriers should be based on a range of stream flows in order to establish a rating curve of changes in the horizontal distance from the fall's crest to the plunge pool, and other features.  (Decl. of Don C. Erman [Docket #46], filed April 3, 2011, ¶ 5.)

In response, defendants maintain the Agencies properly relied on the CDFG's Senior Hydraulic Engineer who viewed the downstream barrier during low flow conditions, but also concluded that "[u]nder high flow conditions, the vertical magnitude of the barrier is reduced, but, due to the narrowness of the gorge and the steepness of the stream channel, it is my opinion that the excessive air entrainment and turbulence in the flowing stream will continue to prevent fish from moving upstream through the

14

barrier reach." (AR 15102.)

In support of their second NEPA claim that defendants relied on faulty information in choosing the Proposed Action Alternative, plaintiffs assert that defendants misrepresented the potential effectiveness of the Combined Physical Removal Alternative in meeting the goal of establishing PCT in Silver King Creek. According to plaintiffs, defendants failed to disclose evidence of field experience and published studies proving that physical removal methods can be effective in the Sierra Nevada. (Pls.' Mot. For Summ. J. and Injunctive Relief, 15:25-27.) Specifically, plaintiffs assert that a USFS project, using physical removal methods on the Upper Truckee River, will take only two seasons using four to five two-person crews to complete. (Id. at 17:6-8.) Moreover, according to plaintiffs, defendants failed to explain why physical removal would be unsuccessful in Silver King Creek when it has been successful in similar streams in the region. (Id. at 16:19-20.)

In response, defendants point out that the Agencies discussed the physical removal program on the Upper Truckee River in the EIR/EIS, and distinguished that program from this Project on Silver King Creek. (USFWS and USFS's Opp'n, 25:11-16.) According to defendants, unlike the successful program on the Upper Truckee River, the Physical Removal Alternative, here, will be ineffective because (1) the Project goal is to eradicate a hybridizing non-native species instead of controlling a competing non-native species, (2) Silver King Creek is a complex high-gradient system and not a shallow, low-gradient system, and (3) there are no barriers within the Project area except at either end to allow the

15

Agencies to treat short sections like on the Upper Truckee River. (Id. at 25:17 to 26:7.)  As to the Sequoia-Kings Canyon National Park project, also cited by plaintiffs, defendants emphasize that the USFWS' ROD addressed that project and contrasted the efforts there by noting that the streams that were successfully eradicated in the Canyon are short in length, small in width, have effective downstream barriers which prevent fish from re-invading and all but one stream are ephemeral; none of these conditions are present in Silver King Creek.

In support of their third NEPA claim that defendants failed to use accurate scientific data in the 2004 Plan, plaintiffs assert that the Agencies unjustifiably changed the recovery criteria from the 1985 Plan criteria.  (Pls.' Mot. For Summ. J. and Injunctive Relief, 13:24-15:12 and 19:3-10.)  Specifically, plaintiffs assert the change in the recovery criteria is unjustified because 2004 Plan did not explain why the recovery criteria changed from a "stable or increasing overwintering population of 500 or more adult fish," in the 1985 Plan, to a secure population with three or more age classes for five years, consisting of a minimum of 2,500 fish that are greater than seventy-five millimeters. (Id. at 18:16-21.)  In addition, plaintiffs point out that the EIR/EIS classifies adult fish as individuals greater than 150 mm, and not 75 mm, thereby inaccurately identifying whether existing PCT populations in Silver King Creek meet the recovery criteria of the 2004 Plan. (Id. at 20:1-8.)

In response, defendants point out that plaintiffs offer no explanation for why the Agencies' recovery criteria is subject to

16

review under NEPA.  (USFWS and USFS's Opp'n, 27:5-9.)  Still, the
defendants contend that the Agencies developed the new criteria
from peer reviewed literature.  (<u>Id.</u> at 27:15-21.)

In support of their fourth NEPA claim that defendants failed
to consider and disclose effects from the poisons, plaintiffs
point to studies that connect rotenone to Parkinson's disease,
evidence that past treatments have caused high-concentrations of
rotenone to persist after the treatment period, and unintentional
killings of fish downstream of the treatment area.  (Pls.' Mot.
For Summ. J. and Injunctive Relief, 21:6-27.)  Plaintiffs also
assert the EIR/EIS failed to disclose the potential toxic effects
of cube resins contained with the rotenone formulations and that
the poisons may be administered by use of gel or sand matrices.

In reply, defendants point to the EIR/EIS discussion of
studies investigating the connection between rotenone and
Parkinson's disease, which mention that those studies showed no
cause and effect relationship between rotenone exposure and
Parkinson's disease.  (AR 318.)  Additionally, defendants assert
that the Project will not result in the persistence of rotenone or
accidental fish kills because the Project includes a contingency
plan, site safety plan, a site security plan, final implementation
and neutralization plans in accordance with the Lahontan Region
Water Quality Control Board's NPDES permit, and will employ
improved monitoring methodologies that have greater precision for
measuring potassium permanganate.  (<u>Id.</u> at 29:17 to 30:21.)  As to
cube resins and the forms of treatment, defendants contend the
EIR/EIS disclosed that the full extent of the potential toxicity
of cube resins is unknown but that ultimately the Agencies

believed, based on the relevant science, that the resins would not substantially affect the toxicity of the rotenone application, and contrary to plaintiffs' suggestion, the Agencies disclosed the potential use of gel and sand matrices to dispense the rotenone, which are not prohibited applications by the label.

Finally, in support of their claim that defendants failed to comply with the Wilderness Act, plaintiffs assert that the Project's use of a gasoline-powered auger does not qualify for an exception to the Act's prohibition against motorized equipment; that the Project elevates the goal of recreational angling over the goal of preserving wilderness character; and that the Agencies fail to prove that the Project is necessary to meet the Act's minimum requirements to administer wilderness. (Pls.' Mot. For Summ. J. and Injunctive Relief, 24:21-26.) Specifically, plaintiffs assert that the Act prohibits the Project's use of the motorized equipment because the Project is not restoring a species fundamental to the overall natural health of the ecosystem, and the Combined Physical Removal Alternative would be feasible without potentially killing endemic or native invertebrate species in Silver King Creek. (Id. at 26:1-20.)

Defendants respond, arguing that the Agencies met their burden of demonstrating that the use of motorized equipment was necessary to meet the goal of restoring PCT. (USFWS and USFS's Opp'n, 33:14-17.) Specifically, the Agencies determined that the use of a motorized auger at the neutralization site was the most effective method of applying potassium permanganate, compared to the drip system, and would minimize the human and ecological effects of the application. (Id. at 33:18-20.) In addition, the

18

Agencies assert that, while the Combined Physical Removal Alternative would avoid the effect of chemical treatment, that alternative would be unsuccessful in reaching the conservation goal of the project.  (Id. at 35:7-10.)  Defendants point out that plaintiffs do not contest the proposition that recovery of the PCT is a conservation goal consistent with the purposes of the Act. (Id. at 33:8-17.)

**STANDARD**

**A.    Summary Judgment**

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1608 (1970).

When parties submit cross-motions for summary judgment, the court must review the evidence submitted in support of each cross-motion and consider each party's motion on its own merits.  Fair Housing Council of Riverside County, Inc. v. Riverside Two, 249 F.3d 1132, 1136 (9th Cir. 2001).  The court must examine each set of evidence in the light most favorable to the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

In this case, the parties agree that there are no material facts in dispute.  It is well-established that where, as here, plaintiffs seek judicial review under the APA, the scope of the review is confined to the administrative record compiled by the agency or agencies and presented to the court.  In considering such cases, there are no disputed facts and no genuine issues of material fact precluding summary judgment.  See e.g., Fla. Power &

1  <u>Light Co. v. Lorion</u>, 470 U.S. 729, 744 (1985).

2  **B.    <u>APA</u>**

3       Plaintiffs bring the instant challenges under NEPA and the

4  Wilderness Act pursuant to the APA.   Thereunder, the court may set

5  aside a final agency action only where the action is "arbitrary,

6  capricious, an abuse of discretion, or not otherwise in accordance

7  with the law."  5 U.S.C. § 706.  Review under the APA is

8  "searching and careful." <u>Ocean Advocates v. United States Army</u>

9  <u>Corps of Eng'rs</u>, 361 F.3d 1108, 1118 (9th Cir. 2004).   However,

10  the court may not substitute its own judgment for that of the

11  agency.  <u>Id.</u>   In short, the court must ensure that the agency has

12  taken a hard look at the environmental consequences of its

13  proposed action.  <u>Oregon Natural Resources Council v. Lowe</u>, 109

14  F.3d 521, 526 (9th Cir. 1997).  As part of this inquiry, the court

15  should ask "whether the [] decision was based on a consideration

16  of the relevant factors and whether there has been a clear error

17  in judgment." <u>Ocean Advocates</u>, 361 F.3d at 1118.   In addition,

18  the court determines "whether the agency articulated a rational

19  connection between the facts found and the choice made." <u>Id.</u> at

20  1118-19 (quoting <u>Arizona Cattle Growers' Ass'n v. United States</u>

21  <u>Fish and Wildlife Serv.</u>, 273 F.3d 1229, 1236 (9th Cir. 2001)).

22       In <u>The Lands Council v. McNair</u>, 537 F.3d 981 (9th Cir. 2008),

23  the Ninth Circuit emphasized a court's proper role in reviewing

24  agency action in an environmental case:[20]   The court reaffirmed

25  ───────────────

26       [20]    Indeed, the court remarked that "in recent years, [the
    court's] environmental jurisprudence has, at times, shifted away
27  from the appropriate standards of review and could be read to
    suggest that this court should play . . . [the] role" of a "panel
28  of scientists that instructs the [FS] how to validate its
    hypotheses . . . [how to] choos[e] among scientific studies . . .

that the role of the court is necessarily at its most deferential

when assessing the agency's consideration of technical matters.

Id. at 993 (recognizing that the court is not to make "fine-

grained judgments of [the science's] worth").  The court is to be

"'most deferential'" when the agency is "'making predictions,

within its [area of] special expertise, at the frontiers of

science.'"  Id. (citing Forest Guardians v. U.S. Forest Serv., 329

F.3d 1089, 1099 (9th Cir. 2003)).  In that role, a reviewing court

is not to entertain a "battle of the experts" when plaintiffs

proffer expert testimony to set against the agency's professional

judgment.  Id. at 1000.  "When specialists express conflicting

views, an agency must have discretion to rely on the reasonable

opinions of its own qualified experts even if, as an original

matter, a court might find contrary views more persuasive."  Id.

Ultimately, the reviewing court must:

> look to the evidence the [the agency] has provided to support
> its conclusions, along with other materials in the
> record, to ensure the [the agency] has not, . . . relied on
> factors which Congress has not intended it to consider,
> entirely failed to consider an important aspect of the
> problem, offered an explanation for its decision that
> runs counter to the evidence before the agency, or [an
> explanation that] is so implausible that it could not be
> ascribed to a difference in view or the product of agency
> expertise.

Id. at 993 (internal quotations omitted).

     As a "non-scientist," the court cannot impose bright-line

rules on the agency regarding particular means that it must take

in every case to show compliance with NEPA's or the Wilderness

---

., and orde[r] the agency to explain every possible scientific
uncertainty."  Id. at 988.  However, the court in McNair made
clear that this is *not* a role the court should play under APA
review.  Id.

Act's requirements.  See id. at 994-94.  Rather, the "[the agency] must support its conclusions that a project meets the [laws'] requirements . . . with studies that the agency, in its expertise, deems reliable.  The [agency] must explain the conclusions it has drawn from its chosen methodology and the reasons it considers the underlying evidence to be reliable."  Id. at 994.  The court may conclude that an agency acts arbitrarily and capriciously only when the record "plainly demonstrates that the [agency] made a clear error in judgment" in concluding that a project meets the requirements of NEPA or the Wilderness Act.  Id.

**C.  Injunctive Relief**

After having shown success on the merits of a claim, to be entitled to permanent injunctive relief, a plaintiff must establish the following: (1) the likelihood of irreparable injury;[21] (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. Sierra Forest Legacy v. Sherman, No. 09-17796, 2011 WL 2041149, at *16 (9th Cir. May 26, 2011)

---

[21]   In Winter, the United States Supreme Court made clear that even where a plaintiff has shown a strong likelihood of success or success on the merits of its claims, the plaintiff still must show a likelihood of irreparable harm--the mere possibility of irreparable harm is insufficient.  Winter v. NRDC, 129 S.Ct. 365, 375-76 (holding that "[i]ssuance of a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief").

**ANALYSIS**

**A.    Success on the Merits**

    **1.    NEPA**

      NEPA mandates that federal agencies prepare a detailed Environmental Impact Statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(c).  These statements must include a description and analysis of the environmental impact of the proposed action, any adverse environmental effects that cannot be avoided if the action is implemented, alternatives to the proposed action, the relationship between short-term uses and long-term productivity, and any irreversible or irretrievable commitment of resources that would be involved if the action were to be implemented.  Earth Island Inst. v. U.S. Forest Serv., 442 F.3d 1147, 1153 (9th Cir. 2006).  "In short, NEPA requires that a federal agency 'consider every significant aspect of the environmental impact of a proposed action' and 'inform the public that it has indeed considered environmental concerns in its decisionmaking process.'"  Id. (quoting Kern v. U.S. Bureau of Land Mgmt., 284 F.3d 1062, 1066 (9th Cir. 2002)).

      NEPA does not any contain substantive environmental standards but instead only establishes procedural requirements to ensure that agencies take a "hard look" at the environmental impacts of their actions.  Earth Island, 442 F.3d at 1154.  "A hard look includes 'considering all foreseeable direct and indirect impacts.'"  Id. at 1159.  A hard look also includes "a discussion of adverse impacts that does not improperly minimize negative side effects."  Id. at 1159.  The Forest Service, therefore, must

23

undertake a thorough environmental analysis before concluding that no significant environmental impact exists." Id. Ultimately, in reviewing the adequacy of an EIS, the Ninth Circuit applies the "rule of reason" standard, "which requires 'a pragmatic judgment whether the EIS's form, content and preparation foster both informed decision-making and informed public participation.'" Native Ecosystems Council v. U.S. Forest Service, 418 F.3d 953, 960 (9th Cir. 2005).

Here, plaintiffs make four central arguments for why defendants violated NEPA in the preparation of the EIR/EIS: (1) defendants failed to perform feasible studies to consider effects on: (a) aquatic invertebrates; and (b) barriers to upstream migration; (2) defendants failed to rigorously explore and evaluate a physical removal alternative; (3) the PCT recovery criteria are not based on accurate scientific data; (4) defendants failed to fully analyze and disclose the effects of rotenone and potassium permanganate, including: (a) how dangerous rotenone is; (b) the impacts of cube resins; and (c) the different forms of treatment.  The court briefly addresses each of these arguments in turn below.[22]

---

[22]    While the parties spent the majority of their papers discussing NEPA, as the court made clear at the hearing, in its view, the heart of this dispute lies in the Wilderness Act. While plaintiffs raise a number of detailed arguments under NEPA, those arguments are easily resolved in defendants' favor by application of the governing standards which mandate that this court defer to the Agencies' decisions absent a *clear error* in judgment.  For reasons which can be succinctly stated, no such clear errors in judgment have been shown by plaintiffs in this case.

a.   **Feasible Studies**

1.   **Aquatic invertebrates**

Plaintiffs contend the Agencies violated NEPA by failing to conduct a study to rule out the possibility that rare and endemic species of benthic macroinvertebrates (aquatic invertebrates) exist in the stretch of Silver King Creek between Llewellyn Falls and Silver Canyon Creek that may be extirpated by the application of rotenone.  Via their expert Nancy Erman's declaration, plaintiffs provide evidence that species-level studies of macroinvertebrates have been conducted for aquatic insects. Plaintiffs maintain that endemic species of aquatic invertebrates, including stoneflies and caddisflies have been identified through species surveys in other locations in the Sierra Nevada Mountains. (UF #146.)  Erman also attests that a reasonable inventory of macroinvertebrate species in the Silver King Creek watershed could be feasibly conducted in two to three years.  (Erman Decl., ¶s 11-16.)  According to plaintiffs, the absence of species studies for the Project area results in a violation because NEPA regulations state that when information relevant to a reasonably forseeable significant impact is incomplete, the agency shall include complete information in the EIS.  40 C.F.R. § 1502.22(a).[23]

---

[23]   Contrary to plaintiffs' argument, the court did not previously rule on this issue in its 2005 order granting plaintiffs a preliminary injunction.  While the court noted that "there has not been any studies to confirm" whether or not rare and endemic macroinvertebrates exist in the Silver King Creek project area, the court did not hold that the Agencies had violated NEPA by failing to conduct a study to rule out the possibility that rare and endemic species of aquatic invertebrates exist in the project area.  Californians for Alternatives to Toxics v. Troyer, 2005 WL 2105343 (E.D. Cal. Aug. 31, 2005).

Contrary to plaintiffs' suggestions, "NEPA does not require the government to do the impractical." Inland Empire Pub. Lands Council v. US Forest Service, 88 F.3d 754, 764 (9th Cir. 1996). As noted by the Supreme Court, "[p]ractical considerations of feasibility might well necessitate restricting the scope of comprehensive statements." Kleppe v. Sierra Club, 427 U.S. 390, 414 (1976). Ultimately, "the existence of uncertainty does not preclude the agency from taking action, so long as that uncertainty has been identified." Sierra Nev. Forest Prot. Campaign v. Rey, 573 F. Supp. 2d 1316, 1345 (E.D. Cal. 2008), aff'd 2011 WL 2041149 at *9-15 (9th Cir. May 26, 2011). See also Jicarilla Apache Tribe of Indians v. Morton, 471 F.2d 1275, 1280 (9th Cir. 1973) (holding "If we were to impose a requirement that an impact statement can never to be prepared until all relevant environmental effects were known, it is doubtful that any project could ever be initiated.") The Ninth Circuit has stated further: "It would suffice if the statement pointed out this deficiency. The decisionmakers could then determine whether any purpose would be served in delaying the project while awaiting the development of such criteria." Id. at 1281 n.11; Sierra Club v. Sigler, 695 F.2d 957, 970 (5th Cir. 1983) ("Notably, the unavailability of information, even if it hinders NEPA's 'full disclosure' requirement, should not be permitted to halt all government action.")

In this case, the Agencies complied with NEPA by:  First, gathering and analyzing the available and substantial data regarding the Project's effects on aquatic invertebrates (AR 260-272; AR 33648-33917).  Contrary to plaintiffs' assertion, the

26

Agencies have performed extensive aquatic invertebrate sampling and community characterization in Silver King Creek in preparation for the Project; historic macroinvertebrate data were collected in 1977, 1978, 1983, 1984, 1987, and 1991 through 1996. (AR 248.)   In addition, in preparation for this restoration project, the Agencies conducted annual monitoring of Silver King Creek aquatic invertebrates from 2003 through 2006.   Id.   The sampling design was modified by the Forest Service in 2007 to collect as many different kinds of invertebrates living at the site as possible, and data was collected in 2007 and 2008 using this modified sampling design and will continue following completion of the restoration project.   Id.   The potential effects of rotenone in Silver King Creek on macroinvertebrates were then assessed by reviewing published studies and analyzing all available data (historic and recent) from Silver King Creek where rotenone has been used in various treatments over the last forty years. (AR 248, 540-815 ["Analysis of the Effects of Rotenone on Aquatic Invertebrates"].)   Aquatic invertebrate sampling is currently being conducted in accordance with the guidelines set forth in the peer-reviewed Aquatic Invertebrate Interagency Monitoring Plan contained in Appendix E of the Final EIR/EIS. (AR 818-869.) Thus, as properly concluded in the EIR/EIS, the Agencies have conducted extensive macroinvertebrate studies over more than 30 years in Silver King Creek (including the ongoing study) and post-treatment monitoring of macroinvertebrates would continue.

Second, the Agencies disclosed the above effects in the EIR/EIS (AR 242-251, 260-272).

27

Third, the Agencies acknowledged the possibility that, although unlikely and despite the fact that no endemic macroinvertebrate taxa have been found to date in the Silver King Creek Watershed, the Project could result in the temporary or permanent loss of rare species that have not been identified or described in the stretch of Silver King Creek between Llewellyn Falls and Silver King Canyon, (AR 245, 247, 270.)

Fourth, they explained that a species-level survey of aquatic invertebrates was not available and articulated why conducting such a survey was not feasible. (AR 242-251.)  According to defendants, a species inventory is infeasible because: (1) due to the lack of existing inventory data, a complete inventory of aquatic invertebrates would be necessary, requiring an intensive effort beyond the scope of the Project (AR 245-46);[24] (2) the state of the art of benthic invertebrate taxonomy is not sufficiently advanced to allow identification to the species level (AR 246); (3) an inventory would require sampling at multiple stations over different seasons and across multiple years and as such obtaining this information is beyond the scope of the Project (Id.); and (4) even a complete species inventory may not determine if a species, which is absent after a rotenone treatment, was actually absent or whether it was missing during the sampling.  (AR 247.)

---

[24]     A study included in the EIR/EIS reported that there have been no complete inventories of invertebrates in any body of freshwater worldwide, much less Silver King Creek. (AR 246, 881.) The EIR/EIS reported further that a complete inventory has been attempted at only a few creeks in the world (e.g., Breitenback Stream in German) and after many years of collection, new species continue to be found. (AR 246.)

While plaintiffs disagree with certain of the Agencies' scientific findings and offer expert testimony in rebuttal, under NEPA, a reviewing court is not to entertain a "battle of the experts" when plaintiffs proffer expert testimony to set against the agency's professional judgment. McNair, 537 F.3d at 1000. "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." Id. Ultimately, the reviewing court must not itself "act as a panel of scientists that instructs the Frost Service how to validate its hypotheses . . . , [how to choose] among scientific studies . . . , [or] orde[r] the agency to explain every possible scientific uncertainty." Id. at 998. The proper role of the court is "simply to ensure that the Forest Service made no 'clear error of judgment' that would render its action 'arbitrary and capricious.'" Id. at 993. No such clear error in judgment is present in this case.

## 2.   Barriers to upstream mitgration

Plaintiffs contend the Agencies failed to establish the existence of a barrier to upstream fish passage at Silver King Canyon. Plaintiffs assert the Agencies have presumed a barrier exists when no evidence exists of an actual barrier. Indeed, plaintiffs state that in 1994 the Agencies had taken the position that the barriers were only "potential" (AR 33247), and the later studies relied on by the Agencies were conducted in autumn when flows in the Silver King Creek were minimal and the efficacy of the presumed barriers was optimal. Via their expert Don Erman, plaintiffs argue that field visits solely at low-flow times of the

year are not a scientifically appropriate way to measure whether impassability exists.  (D. Erman Decl., ¶ 7.)  Plaintiffs contend the Agencies could have easily conducted studies that would measure dimensions and hydraulic features of the presumed barriers at a variety of streamflows, instead of just viewing falls at low water, to determine the efficacy of any barrier, but they failed to do so.  (Id. at ¶s 3-5.)  According to plaintiffs' expert, who visited the site and reviewed video and photos of the creek at high flows during the spring, the presumed barriers may be greatly changed at the exact time when rainbow trout, Lahontan cutthroat trout or hybrids are moving upstream to spawn.  (Id. at ¶ 10-11, 14.)  Absent these types of studies, plaintiffs argue the EIR/EIS fails to provide high quality information or accurate scientific data to support the determination that there are secure, permanent barriers to upstream fish migration.

Plaintiffs' arguments are unavailing.  Here, the Agencies adequately addressed whether the barriers in Silver King Canyon are impassable to fish swimming upstream and responded to reasonable opposing views.  In determining that the barriers were effective, the Agencies relied, inter alia, on: (1) an inspection and assessment of the barrier by an Associate Fishery Biologist for the California Department of Fish and Game's Wild Trout Management in 1994 (AR 6571); (2) an inspection and assessment of the barrier by the California Department of Fish and Game's Senior Hydraulic Engineer in 2000 (AR 15101-15102);[25] and (3) a study by

_____

[25]    The engineer noted that the primary feature of the barrier is a waterfall that has been created by a huge boulder (20 feet or more) that was deposited in the channel. The boulder is surrounded by other large boulder streambed features and

the California Department of Fish and Game in 2009 (which was commissioned to respond to various comments on the 2009 Draft EIR/EIS) of the leaping capability of a 14-inch adult fish (even though the largest rainbow trout captured during a fish size distribution analysis in Silver King Creek in 2006 was 10.2 inches long) (AR 16248).[26]

Moreover, contrary to plaintiffs' contention that the Agencies failed to consider the effectiveness of the barrier under high flow conditions, the California Department of Fish and Game's Senior Hydraulic Engineer stated: "Under high flow conditions, the vertical magnitude of the barriers is reduced, but, due to the narrowness of the gorge and the steepness of the stream channel, it is my opinion that the excessive air entrainment and turbulence in the flowing stream will continue to prevent fish from moving upstream through the barrier reach." (AR 15102.) He concluded by acknowledging that there may be a remote chance that the right fish, at the right place, at the right flow, might get lucky and pick its way upstream, but stated: "I think this would be a very remote chance." (AR 15102).

---

bedrock canyon walls. "The result is a complex waterfall which drops approximately 10 feet vertically on the left side of the main boulder and cascades through a tightly spaced series of smaller drops around the right side of the boulder, over a distance of 20 to 30 feet. (Id. at AR 15101.) Two smaller, yet significant, falls/barriers are located downstream. The engineer stated that, after viewing the primary falls barrier and the associated smaller barriers, his conclusion was that "these features most likely constitute a total barrier to fish passage." Id.

[26]   This study concluded that although they could not definitively state that the rainbow trout (who have the greatest capacity for leaping falls of any migratory salmonid) could never pass this series of barriers, "the chance of this occuring should be considered removed." (AR 16248.)

1  The Agencies also acknowledged that not all of the commentors

2  agreed with the Agencies' determination that impassible barriers

3  to fish passage exist in Silver King Canyon, but explained the

4  methodology and reasons behind their determination that such

5  barriers do in fact exist.

6  This is all that NEPA requires of the Agencies.  See Earth

7  Island Inst. v. US Forest Servs., 351 F.3d 1291, 1301 (9th Cir.

8  2003) ("[An] agency is entitled to wide discretion in assessing

9  the scientific evidence, so long as it takes a hard look at the

10  issues and responds to reasonable opposing viewpoints."); Inland

11  Empire Pub. Lands Council v. Schultz, 992 F.2d 977, 981 (9th Cir.

12  1993) ("We defer to agency expertise on questions of methodology

13  unless the agency has completely failed to address some factor.");

14  Greenpeace Action v. Franklin, 14 F.3d 1324, 1332 (9th Cir. 1992)

15  (stating that the court must defer to the findings made by the

16  agency relying on reasonable opinions of the agency's experts even

17  if, as an original matter, the court may find contrary views more

18  persuasive).[27]

19  **b.   Evaluation of a Physical Removal Alternative**

20  Plaintiffs contend the agencies failed to rigorously explore

21  and evaluate a physical removal alternative in the EIR/EIS and

22  point to two projects (the USFS's Lake Tahoe Basin Management

23  Unit's brook trout eradication program and a program within the

---

25  [27]   Defendants alternatively asserted that plaintiffs'
26  barrier arguments raised issues beyond the scope of NEPA.
   However, here, plaintiffs contend that because adequate studies
   of the alleged barriers were not conducted, the EIR/EIS fails to
27  provide accurate scientific data to support the Agencies'
   conclusion that secure, permanent barriers exist to upstream fish
28  migration.  This is an appropriate argument under NEPA.

Sequoia-Kings Canyon National Park) which they contend demonstrate
that removal of fish can be accomplished using entirely physical
means.

Contrary to plaintiffs' argument, the Agencies addressed the
Lake Tahoe and Sequoia-Kings projects in the EIR/EIS and their
RODs and explained why the physical removal methods used in those
projects would not be successful in Silver King Creek.  (AR 12,
883-85, 916-17.)  The Lake Tahoe brook trout eradication program
employed gill nets in several small lakes and electrofishing
methods in approximately 10 miles of stream in the Upper Truckee
River watershed.  The Agencies addressed the program in the
EIR/EIS and explained why the methods used in that program will
not work in the Silver King Creek project area.  More
specifically, the Agencies explained that electrofishing has been
most effectively used where, as is the case in the Upper Truckee
River, the project goal is the control of a competing non-native
species (as is the case in the Upper Truckee River), rather than
the eradication of hybridizing non-native species (as is the case
in Silver King Creek). (AR 883-84.)  The Agencies emphasized that
when native species coexist with competing or predatory species,
reduction and suppression of the non-native species may be a
management option because reducing the population of the
non-native species decreases their ability to suppress the native
species. (AR 883.)  By contrast, when native species coexist with
a hybridizing non-native species, complete eradication is required
because if only a few hybridizing individuals are left in the
population, they can still reproduce with the native species and
all offspring will be hybrids, which perpetuates the problem. (AR

33

883.)

The Agencies also acknowledged that physical removal has been shown to be sometimes effective in shallow, low-gradient streams with few undercut banks and lacking habitat complexity and, for that reason, manual removal has been tentatively successful in the Upper Truckee River watershed. (AR 916.)  By contrast, the project area in Silver King Creek is a complex high-gradient system with large boulders, cobbles, deep pools and large wood debris. (AR 916-17, 12, 885.)

Further, the Agencies explained that numerous barriers in the Upper Truckee River allow biologists to treat short sections of stream without brook trout re-invading.  Silver King Creek, by contrast, does not have barriers within the treatment area except for Llewellyn Falls and the series of barriers in Silver King Canyon. (AR 916-17, 12.)  Moreover, while plaintiffs characterize the Agencies' determination that physically removing non-native fish from the Silver King Creek could take more than 10 years as "hyberbole," the very project plaintiffs cite as evidence of the effectiveness of physical removal is estimated to take 15 years to complete. (AR 884.) ("The LTBMU estimates that it may take 15 years to eradicate non-native fish from their proposed project area.").

As for the Sequoia-Kings project, the USFWS's ROD addresses this Project and contrasts the efforts in Sequoia-Kings Canyon National Parks by noting that the streams that were successfully eradicated there are short in length, small in width, have effective downstream barriers which prevent fish from re-invading, and all but one are ephemeral. (AR 12.)

34

Ultimately, the Agencies rigorously addressed the advantages and disadvantages of using physical means of removing non-native fish in the Project area and came to a reasoned conclusion that, while electrofishing and other physical methods are a legitimate way to eradicate non-native fish under certain circumstances, these conditions do not exist in the Silver King Creek project area. (AR 12, 880.)  NEPA requires no more.  <u>See</u> <u>Center for</u> <u>Biological Diversity v. U.S. Dep't of Interior</u>, 623 F.3d 633, 642 (9th Cir. 2010) (stating that under NEPA, the agency is to rigorously explore and objectively evaluate *reasonable* alternatives).

### c.  PCT Recovery Criteria

Plaintiffs contend the 2004 Revised Pauite Cutthroat Trout Recovery Plan arbitrarily and capriciously changed the standard for what it means to "recover" PCT from the standard set forth in the 1985 Recovery Plan.  Defendants are correct that the court need not reach the substantive merits of this claim as it raises an issue beyond the scope of NEPA review.  Plaintiffs are asking the court to second-guess the wisdom of the Agencies' decision to engage in the Project in the first place; they contend the Project is unnecessary because the 2004 Plan incorrectly determined that the restoration of the PCT to its historic habitat in Silver King Creek is required.  NEPA requires that agencies take a "hard look" at the environmental consequences of a project.  It does not provide a vehicle to challenge the underlying Project itself.  <u>Okanogan Highlands Alliance v. Williams</u>, 236 F.3d 468, 473 (9th Cir. 2000).  NEPA exists to "ensure a process, not to ensure any result."  <u>Inland Empire Pub. Lands Council</u>, 88 F.3d at 758.

Plaintiffs' challenge to the 2004 Plan's recovery criteria is not cognizable under NEPA.

### d.   Effects of Rotenone

Plaintiffs first assert the EIR/EIS fails to take a "hard look" at the dangerous, ecological effects of rotenone because: (1) the Agencies ignored a comment that noted the existence of 352 studies linking rotenone and Parkinson's disease; plaintiffs maintain that the EIR/EIS does not reveal that the Agencies "analyzed and disclosed" these studies; and (2) plaintiffs also contend that the Agencies failed to disclose and evaluate the effects of the potassium permanganate application in Lake Davis, which plaintiffs maintain is a "prime example of [defendants] inability to get it right."

Plaintiffs' contentions are without merit.  The ecological effects of rotenone were exhaustively analyzed in a Screening-Level Ecological and Human Health Risk Assessment conducted in 2010 (Appx. C to EIR/EIS) and fully disclosed to the public in Section 5.4 of the EIR/EIS.  (AR 468-538.)  That Assessment includes an analysis of the potential hazards of rotenone, including an assessment of the environmental fate of the compounds, considering their partitioning within the environment and the rates and mechanisms by which the compounds naturally biodegrade so that they do not persist in the environment over long periods.  The Agencies also properly relied on the EPA's human health risk assessment and ecological risk assessment which concluded that the "currently registered uses of rotenone will not pose unreasonable risks or adverse effects to humans or the environment if the requirements for registration" are followed.

(AR 30701.)

Also, contrary to plaintiffs' suggestions, the EIR/EIS addressed public comments expressing concern about a possible connection with rotenone use and Parkinson's disease.  For example, the Agencies acknowledged an Emory University study that had found that rotenone produced Parkinson's-like anatomical, neurochemical and behavioral features in some laboratory rats when administered chronically and intravenously into the right jugular vein for 5 weeks.  (AR 318, 7783-88.)  However, the EIR/EIS noted that the study was not designed to establish thresholds of human exposure or to evaluate human health effects from environmentally-relevant pathways for exposure to rotenone.  (AR 924).  Thus, the Agencies concluded that the study did not show a cause and effect relationship between rotenone exposure and Parkinson's disease.  Moreover, the Ninth Circuit has recognized that NEPA does not require an agency to set forth at length all of the views for which it disagrees; rather, it must only supply a reasoned basis for the views it announces.  See California v. Block, 690 F.2d 753, 773 (9th Cir. 1982).

Finally, the EIR/EIS adequately disclosed the previous problems at Lake Davis and described the improved methods that will be used in this Project.  The EIR/EIS acknowledged that excessive doses of potassium permanganate occurred in 1997 at Lake Davis, following a rotenone treatment.  The overdosing resulted in unintentional fish kills in the area.  (AR 319.)  However, the EIR/EIS concluded that the Agencies do not believe that will happen in this project area because they will employ monitoring methodologies as outlined in Parmener and Fujimura (1995) and

37

1 further refined by Fujimura (2006) that have greater precision for
2 measuring potassium permanganate.  (AR 319, 19397-19402,
3 14821-14833.)  The USFWS"s ROD also discussed the treatment of
4 Lake Davis, stating that those treatments were conducted using
5 primarily spray application while this Project will be conducted
6 primarily through the use of controlled drip stations that will be
7 frequently evaluated via volumetric measuring which is more likely
8 to yield uniform concentrations than the spray treatment method
9 used in Lake Davis.  (AR 16.)  Plaintiffs cannot establish a NEPA
10 violation based on previous mistakes.  The Agencies acknowledged
11 the past errors and addressed how they would attempt to avoid the
12 same mistakes in this Project.

13    Next, plaintiffs contend that the Agencies failed to discuss
14 the full impacts of "cube resins."  The Agencies authorized the
15 use of CFT Legumine, which has as its active poisons 5% rotenone
16 and 5% "other cube resins."  According to plaintiffs, cube resins
17 may include toxic substances such as deguelin and tephrosin, which
18 can interfere with mitochondrial functioning.

19    While plaintiffs may not agree with the Agencies'
20 conclusions, there was not a failure to consider this issue.
21 The EIR/EIS disclosed the use of cube resins and described that
22 while the full extent of the potential toxicity is unknown (AR
23 507-08), the relevant science supported a finding that the resins
24 would not substantially affect the toxicity of the rotenone
25 application.  (Id.) ("toxicity testing with formulated end
26 products suggests that, in general, co-formulants do not
27 substantially affect the toxicity of rotenone based on reported
28 distributions of acute 96 hr LC50 values among different species

38

1  (USEPA)."）  Thus, plaintiffs likewise cannot show a violation of
2  NEPA on this basis.

3      Finally, plaintiffs challenge the EIR/EIS' disclosure that
4  gel or sand matrices may be used to apply rotenone on small seeps.
5  Plaintiffs contend that the EPA has not approved the use of gel or
6  sand matrices as a method for applying rotenone and the CFT
7  Legumine label does not include application by gel packs.

8      Plaintiffs' argument is unavailing.  The Federal Insecticide,
9  Fungicide and Rodenticide Act permits any method of application
10 that is "not prohibited by the labeling unless the labeling
11 specifically states that the product may be applied only by the
12 methods specified on the labeling."  7 U.S.C. § 136 (ee).  Here,
13 the labeling does not prohibit this form of application.
14 Moreover, plaintiffs have not pointed to any evidence suggesting
15 that the application of rotenone by gel packs or sand matrices
16 will have any different environmental impacts than application of
17 rotenone by drip stations or hand spraying.  The EIR/EIS disclosed
18 this potential form of application and concluded that regardless
19 of the form of application, the procedures will be supervised by
20 licensed applicators and in adherence to safety precautions
21 identified on the product label.  Thus, plaintiff also cannot show
22 a NEPA violation on this basis.

23      **2.   Wilderness Act**

24          **a.   Standard of Review**

25      The APA review standard applies to agency decisions made
26 under Wilderness Act authority.  See Wilderness Society v. United
27 States Fish and Wildlife Service, 353 F.3d 1051, 1059 (9th Cir.
28 2003).  Under such review of federal administrative

interpretations of the Wilderness Act, courts use the two-step test set forth by the United States Supreme Court in _Chevron, Inc. v. Natural Resources Defense Council, Inc._, 467 U.S. 837, 843-44 (1984).  Under the first step, if the intent of Congress is clear from the plain meaning of the Act, the court must give effect to the unambiguously expressed intent of Congress.  _Wilderness Society_, 353 F.3d at 1059 (quoting _Chevron_, 467 U.S. at 842-43).  Under the second step, if the statute is silent or ambiguous with respect to the issue at hand, "the review must defer to the agency so long as the 'agency's answer is based on a permissible construction of the statute.'  In this case an agency's interpretation of the statute will be permissible, unless arbitrary, capricious, or manifestly contrary to the statute."  _Id._ (quoting _Chevron_, 467 U.S. at 844).

An administrative interpretation of a particular statutory provision qualifies for _Chevron_ deference when "it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, _and_ that the agency interpretation claiming deference was promulgated in the exercise of that authority."  _Id._ (quoting _United States v. Mead Corp._, 533 U.S. 218, 226-27 (2001) (emphasis original).  However, even if the agency action "may be precedent in later transactions, precedential value alone does not add up to _Chevron_ entitlement."  _Mead_, 533 U.S. at 232.  In the alternative, administrative interpretations "not meeting these standards are entitled not to deference, but to a lesser 'respect based on the persuasiveness of the agency decision'"--the standard set forth in _United States v. Mead Corporation_.  _Wilderness Society_, 353 F.3d at 1067 (quoting

1  <u>Mead</u>, 533 U.S. at 228).

2       In applying the level of review under <u>Mead</u>, the court must

3  look to the process the agency used to arrive at its decision.

4  <u>High Sierra Hikers Ass'n v. Blackwell</u>, 390 F.3d, 630, 648 (9th

5  Cir. 2004) (citations omitted).   Therefore, weight given to an

6  agency's interpretation is a function of that interpretation's

7  "thoroughness, rational validity, . . . consistency with prior and

8  subsequent pronouncement[,] . . . 'logic and expertness' of an

9  agency decision, the care used in reaching the decision, as well

10 as the formality of the process used."   <u>Wilderness Society</u>, 353

11 F.3d at 1068.

12      In <u>Wilderness Society</u>, the Ninth Circuit determined that

13 <u>Chevron</u> deference did not apply to an agency interpretation that

14 would not "naturally bind more than the parties to the ruling."

15 <u>Id.</u> at 1067.   Furthermore, in concluding that <u>Chevron</u> deference

16 was inappropriate, the court noted that the documentation of the

17 decision spoke "in terms specific to the . . . Project . . . and

18 [did] not attempt to draw broader conclusions regarding the

19 permissibility of this type of enterprise within wilderness.

20 Nothing . . . would bind the USFWS to permit a similar activity in

21 another wilderness."   <u>Id.</u> at 1068.

22      Here also, USFS's approval of the EIR/EIS, to apply rotenone

23 and use a generator-powered auger within the Carson-Iceberg

24 Wilderness, does not meet the <u>Chevron</u> standard of judicial

25 deference.   Instead, this agency decision is only entitled to

26 respect based on the persuasiveness of the Agency's justification.

27 <u>Mead</u>, 533 U.S. at 228; <u>see</u> <u>High Sierra Hikers Ass'n v. United</u>

28 <u>States Forest Serv.</u>, 436 F. Supp. 2d. 1117, 1132 (E.D. Cal. 2006)

(determining that <u>Chevron</u> deference is not due a USFS ROD).
Similar to the Special Use Permit at issue in <u>Wilderness Society</u>,
the USFS ROD here approves the Project specifically and does not
bind the USFS to approve a similar project in the future.   For
this reason, the ROD is only entitled to respect based on the
persuasiveness of the USFS's justification for its decision.

### b.   Conservation of PCT as Purpose Consistent with the Wilderness Act

Under this standard of review, courts must first decide
whether the Agencies' determination in this case--that species
conservation is a purpose of the Wilderness Act--runs
unambiguously contrary to the language of the Act.   <u>Wilderness
Watch, Inc. v. U.S. Fish and Wildlife Serv.</u>, 629 F.3d 1024, 1032
(9th Cir. 2010).   An agency charged with administering a
designated wilderness area is responsible for preserving its
wilderness character.   <u>High Sierra Hikers Ass'n</u>, 390 F.3d at 645
(citing 16 U.S.C. § 1133(b)).   In addition, the agency must
administer the area "for such other purposes for which it may have
been established as also to preserve its wilderness character."
<u>Id.</u>   Specifically, the Act dedicates protected wilderness to
"public purposes of recreational, scenic, scientific, educational,
*conservation*, and historical uses."   <u>Id.</u> (emphasis added).

In reference to this statutory language, the Ninth Circuit
has noted that even though the Act is intended to enshrine the
long-term preservation of wilderness areas as the ultimate goal,
these sometimes conflicting responsibilities makes the purpose of
the Act as to *conservation* ambiguous.   <u>Wilderness Watch, Inc.</u>, 629
F.3d at 1033 (quoting <u>High Sierra Hikers Ass'n</u>, 390 F.3d at 647-

42

48).  Therefore, in the absence of a plain meaning for
conservation, this court must decide whether the conservation goal
at issue here is consistent with the Act based on "the
thoroughness evident in [the Agencies'] consideration, the
validity of [their] reasoning, [and the] consistency with earlier
and later pronouncements . . ." in accordance with the Mead
standard of review.  533 U.S. at 228 (citations omitted).

In Wilderness Watch, the Ninth Circuit determined that the
Act included the purpose of bighorn sheep conservation because
(1) the protection of bighorn sheep was one of the principal
motivations for President Roosevelt's designation of the Kofa Game
Range in 1939, and (2) the documentation of the proposal had
demonstrated consistency in recounting the history of the
conservation efforts on behalf of the bighorn sheep.  629 F.3d at
1035.

As in Wilderness Watch, in this case, the meaning of
conservation is not plainly stated within the Act and is,
therefore, ambiguous.  629 F.3d at 1033.  Defendants argue that
recovery of the PCT is plainly consistent with the Wilderness Act
because it is supported by legislative intent, which plaintiffs do
not dispute.  See H.R. Rep. 98-40 (Mar. 18, 1983).  However, the
first step of Chevron analysis excludes any non-statutory material
from the determination of plain meaning.  High Sierra Hikers
Ass'n, 436 F. Supp. 2d at 1130.

Regardless, the USFS's decision here is persuasive in showing
that restoration of the PCT to its native habitat is contained in
the conservation goal of the Wilderness Act, in accordance with
the Mead standard.  The USFS's reasoning for complying with the

Act reflects consistency with both the 1985 and 2004 Plans, as well as the limited legislative record for the designation of the Carson-Iceburg Wilderness.

More specifically, in the EIR/EIS, the Agencies demonstrated a consistent history of federal agencies implementing projects to recover PCT in Silver King Creek.  In fact, these efforts began before the designation of the Carson-Iceburg Wilderness by the California Wilderness Act of 1984, and have continued ever since. (AR 181.)  Second, although the PCT was not cited as a motivation for the Carson-Iceburg Wilderness designation, Congress did acknowledge in HR 98-40 that "certain wildlife management activities, designed to enhance or restore fish populations, are permissible and often desirable in wilderness areas to aid in achieving the goal of preserving the wilderness character of the area."[28]  (Defs.' Opp'n and Cross-Mot. [Docket #54], filed May, 5 2011, at 33:10-13.)  Third, although plaintiffs contend that the historical, geographic distribution of the PCT is disputed and has always been based on conjecture (UF #63), the USFWS has consistently included the Project area (Llewellyn Falls downstream to Silver King Canyon) in the PCT's presumed native habitat.[29]  (AR 32855; 33246.)

Citing High Sierra Hikers Ass'n, plaintiffs contend that the Project's benefits to recreational fishing "elevate recreational

_____

[28]   Defendants represent this statement of intent as being specific to the Carson-Iceburg Wilderness, but it applies generally to the wilderness areas added through the legislation.

[29]   While the court acknowledges that early accounts of Silver King Creek fish populations call into question whether PCT were native to the creek above Llewellyn Falls, no accounts dispute that PCT are endemic to the Project area.  (AR 33246-49.)

activity over the long-term preservation of the wilderness character of the land," and render it entirely contrary to the Act.  However, plaintiffs' reliance on High Sierra Hikers Ass'n is inapposite as their argument fails to distinguish the overall goal of this Project as opposed to the goal in High Sierra Hikers.  436 F. Supp. 2d at 1123-24.  The sole purpose of the project in High Sierra Hikers Ass'n was to maintain a local fishery that had been developed when cattlemen stocked the project area with trout at the beginning of the 20th century.  Id.  In contrast, the stated purpose of the Project here, as represented in the USFS ROD is: "to restore Paiute cutthroat trout to its historic range as stated in the 2004 Revised Paiute Cutthroat Trout Recovery Plan (USFWS 2004), and thereby satisfy[] one critical Recovery Plan component for delisting the species." (FS 5149.)  Thus, unlike High Sierra Hikers Ass'n, reestablishing a native species in a wilderness area, independent of the means for reaching that goal, enhances the primitive character of an ecosystem and serves a conservation purpose (not a recreational purpose), permissible under the Act.

        **c.**    **The Wilderness Act's Exception for Motorized Equipment that is "Necessary" to Meet the "Minimum Requirements" for Conserving PCT.**

The Act prohibits use of motorized vehicles and equipment, among other activities, subject only to one exception: "as necessary to meet minimum requirements for the purpose of this Chapter (including measures required in emergencies involving the health and safety of persons within the area)." 16 U.S.C. § 1133(c).  Therefore, "[it] is clear that the statutory scheme requires, among other things, that the Forest Service make a finding of 'necessity' before authorizing [otherwise prohibited

45

activities] in wilderness areas." High Sierra Hikers Ass'n, 390 F.3d at 646 (citations omitted).

This prohibition is one of the strictest prohibitions in the Act. See Wilderness Watch, 629 F.3d at 1040. "The limitation on the Forest Service's discretion to authorize prohibited activities only to the extent necessary flows directly out of the agency's obligation under the Wilderness Act to protect and preserve wilderness areas." High Sierra Hikers Ass'n, 390 F.3d at 647. Indeed, various district courts in this circuit have concluded that the overall language of § 1133, along with case authority, imply that "when there is a conflict between maintaining the primitive character of the area and between any other use [...,] the general policy of maintaining the primitive character of the area must be supreme." High Sierra Hikers Ass'n v. U.S. Forest Serv., 436 F. Supp. 2d 1117, 1131 (E.D. Cal. 2006)(citing 36 C.F.R. § 293.2(c) ("wilderness values will be dominant to the extent not limited by the Wilderness Act")); see also Wolf Recovery Found. v. U.S. Forest Serv., 692 F. Supp. 2d 1264, 1268 (D. Idaho 2010) ("[t]o constitute administration of the area, the activity must further the wilderness character of the area" (citations omitted)); 16 U.S.C. § 1133(b).

However, the Ninth Circuit has recognized that ultimately:

the Wilderness Act requires a delicate balancing between Congress' desire to maintain lands untouched by humans and Congress' recognition that such an idealistic view is subject to some practical limitations.

Wilderness Watch, 629 F.3d at 1033, 1039-40 (recognizing that Congress "did not mandate that the Service preserve the wilderness in a museum diorama, . . . [i]nstead, Congress stated that the

wilderness was to be preserved as wilderness and made accessible to people, 'devoted to the public purposes of recreational, scenic, scientific, educational, conservation, and historical uses.'"); see also Wolf Recovery, 692 F. Supp. 2d at 1269 (the Act "could have directed that the area remain entirely wild and unmanaged, but it did not take that path").  In fact, the required analysis for Wilderness Act compliance, described more fully below, allows an agency to determine that another purpose consistent with the Act is more important than maintaining pristine wilderness, but in doing so the agency must make the requisite findings.  High Sierra Hikers Ass'n, 390 F.3d at 647 (holding that the Forest Service must balance many competing interests when carrying out its charge to maintain wilderness character of the land, while still serving the other purposes designated by the Act).

     In High Sierra Hikers Ass'n and Wilderness Watch, the Ninth Circuit articulated two ways that the Forest Service can violate the Wilderness Act in granting an exception to otherwise prohibited activities under § 1133(c):  First, the Service may fail to make an adequately reasoned determination that the activity is necessary to achieve a purpose consistent with the Wilderness Act.  "It is clear that the statutory scheme requires, among other things, that the Forest Service make a finding of 'necessity' before authorizing [otherwise prohibited activities] in wilderness areas."  High Sierra Hikers Ass'n, 390 F.3d at 646 (citations omitted).

     In Wilderness Watch, environmental plaintiffs claimed that the USFWS violated the Wilderness Act by building two water tanks

within the Kofa National Wildlife Refuge and Wilderness for declining populations of bighorn sheep.  The Ninth Circuit found that the USFS failed to explain why the construction of structures, otherwise prohibited under § 1133(c), was necessary to conserve bighorn sheep, even though the USFS's own documentation suggested that many other strategies, not prohibited by the Wilderness Act, could have met that same goal.  629 F.3d at 1037. Although the USFS had described their reasons for deciding to construct the two particular structures chosen, the agency did not explain the underlying assumption that structures were necessary at all.  Id. at 1038.

Second, the Service may fail to explain why the extent of the activity is necessary.  A finding of necessity is required, but not wholly sufficient, for allowing an otherwise prohibited activity.  The Agency must explain why the extent of the otherwise prohibited activity is the necessary action as opposed to other strategies that could have met the goal of conserving the target species.  Wilderness Watch, 629 F.3d at 1037.  In explaining why the proposed extent of the activity is necessary, the agency must compare factors relevant to the decision in relation to each other.  High Sierra Hikers Ass'n, 390 F.3d at 647.  Therefore, the Ninth Circuit has held that if complying with the Act on one factor will impede progress towards another factor, "the administering agency must determine the most important value and [justify] its decision to protect that value." High Sierra Hikers Ass'n, 390 F.3d at 646.

In High Sierra Hikers Ass'n, environmental plaintiffs claimed that the USFS had violated the Wilderness Act when it issued

commercial activity permits to packstock operations in wilderness areas.   The Ninth Circuit found that the decision to grant permits in the face of documented damage resulting from overuse did not have rational validity, because it failed to balance the competing interests.   In the Needs Assessment, the USFS examined independently three topics related to the need for commercial services: the types of activities for which commercial services are needed, the extent to which current permits are being used, and the amount of use the land can tolerate.   In the Needs Assessment, the USFS listed the trailheads showing damage from overuse, but it did not take the next step to actually protect those areas by lowering the allowed usage.   "At best, when the Forest Service simply continued preexisting permit levels, it failed to balance the impact that level of commercial activity was having on the wilderness character of the land."   <u>Id.</u> at 647.  It was this 'ultimate interest' and 'overarching purpose' of the Wilderness Act--to protect the Ansel Adams and John Muir Wilderness Areas from degradation--that led the Ninth Circuit to hold that the packstock permit decision violated 'the Forest Service's statutory responsibility.'"   <u>River Runners for Wilderness v. Martin</u>, 593 F.3d 1064, 1077 (9th Cir. 2010) (quoting <u>High Sierra Hikers Ass'n</u> , 390 F.3d. at 647-48).

Here, the USFS adequately reasoned that motorized equipment was necessary to achieve conservation of the PCT.   Although the USFS misinterprets the standard in stating its overall conclusion that the Project is necessary, the Agency provides enough explanation for its decision throughout the Minimum Requirements Decision Guide (the "Guide"), to show a reasoned finding of

necessity.   Specifically, the USFS contends that § 1133(c) provides an exception to this Project because of the necessity of restoring PCT to its historic range.  (FS 5051.)  This assertion is misplaced because the standard requires that the necessity lies in the use of the otherwise prohibited activity, here the use of motorized equipment, and not the merits of the proposed project. The validity of the goal of restoring the PCT does not factor into this analysis.

Regardless, the USFS embeds three reasons in its analysis of why Alternative Two, the Proposed Action Alternative is necessary to achieve recovery of the PCT.  The USFS first reasons that a gasoline-powered generator, used to apply rotenone and potassium permanganate, is necessary because the alternative drip system (proposed in Alternative 3) has proved unsuccessful for adequately dissolving potassium permanganate in solution.  (FS 5061.) Improper application of potassium permanganate could extend the habitat negatively impacted by rotenone.  (Id.)  The second reason given is that non-chemical removal methods under Alternative Three and Four would fail to eradicate small fish, and could have low capture efficiency in a rocky stream environment, with deep pools, undercut banks, and within stream vegetation and debris.  (FS 5059.)  Third, Alternative Two would greatly reduce the presence of agency staff in the wilderness and the pack trips required to transport people and materials.  Alternative Three and Four would require a 10-year effort to eradicate a majority of the non-native species.  (Id.)  Alternatively, Alternative Two would be completed within three years.  (FS 5053.)

Plaintiffs argue that like in <u>Wilderness Watch</u>, the EIR/EIS fails to rigorously analyze or consider Alternative Three, even though there is a strong showing that Alternative Three would be feasible, and would not violate the Act.  However, unlike in <u>Wilderness Watch</u>, in which the Ninth Circuit found that the USFWS did not make an adequate finding of necessity because they "leaped from the worthy goal of bighorn sheep conservation to the need for additional water structures," 629 F.3d at 1038, here the USFS provides three explicit reasons for proposing to use motorized equipment to apply rotenone for this Project, and why other alternatives would not meet the conservation goal.

However, while the Agencies justified the necessity of using motorized equipment as opposed to other methods, they nonetheless violated the Wilderness Act by failing to consider the potential extinction of native invertebrate species as a factor relevant to the decision of whether the *extent* of the project was necessary. In determining whether the extent of Alternative Two was necessary, the USFS considered (1) the effectiveness of the alternative in achieving the conservation goal, (2) how many years agency staff would be present in the wilderness, and (3) the impact that the poison and motorized equipment will have on five wilderness criteria, as relevant factors to that decision.  (FS 5052-63).  In fact, the Guide charts the impact of all four project alternatives--specifically, whether they improve (denoted by a *plus* symbol), or take away (denoted by a *minus* symbol) from any of the five wilderness criterion.  (FS 5064).

However, like in <u>High Sierra Hikers Ass'n</u>, the USFS violated the Wilderness Act by failing to (1) balance competing values, (2)

determine the most important value, and (3) justify the decision
to protect that value.   In High Sierra Hikers Ass'n, the USFS
failed to consider the damage caused by preexisting levels of
wilderness permitting.   Here, the USFS failed to consider the
potential extinction of native invertebrate species.   In
evaluating the impact to wilderness character, the USFS does *not
mention* in the Guide the potential for loss of other native
species (FS 5049-50), despite acknowledging in other sections of
the Guide that chemical treatment would reduce macroinvertebrate
abundance.   (FS 5055.)

          As a result of that failure, the Agencies charted
Alternative Two as having a net positive impact on the wilderness
character of the Carson-Iceburg Wilderness, based on the proposed
benefit of restoring PCT.   (FS 5064.)   This characterization led
to the final conclusion that the Project will create "improved
long term natural conditions of wilderness character through
restoration of a native species."   (FS 5065.)   But in fact,
complying with the Act to conserve PCT by implementing this
Project would *impede* progress towards preserving the overall
wilderness character.   Despite the benefits gained from restoring
a PCT population, accounting for the potential loss of endemic
species would create a net, *negative* impact; the loss of primitive
species would depreciate the wilderness character of the Carson-
Iceburg Wilderness.

          At oral argument, defendants' counsel argued for the first
time that the requisite balancing was performed by the Forest
Supervisor in the May 20, 2010 ROD approving the Project.

However, this document relies on the Guide (see FS 5163)[30] which the court finds insufficient, for the reasons set forth above, and thus, the ROD cannot suffice to meet the applicable standards under the Act.  Moreover, in relying on the ROD, defendants improperly conflate NEPA with the Wilderness Act.  While the Forest Supervisor's review and ultimate approval of the Project is a necessary step in order for permits to issue, that raises a process issue which NEPA addresses.  Indeed, NEPA is about ensuring a particular process in the review of agency action impacting the environment.  Earth Island, 442 F.3d at 1154 (recognizing that NEPA does not contain substantive environmental standards but instead establishes procedural requirements to ensure that agencies take a hard look at the environmental impacts of their actions).  NEPA recognizes that at times, that process considers practicalities, like the feasibility of conducting certain studies.  However, as the court indicated at the hearing, the Wilderness Act is entirely separate from NEPA and must be considered on its own.  It contains broad, substantive statutory mandates which depict pristine character not process.

As opposed to addressing process or practicalities, the Wilderness Act sets forth lofty goals about maintaining the naturalness of the wilderness.  Indeed, Congress enacted the Wilderness Act "to assure that an increasing population, accompanied by expanding settlement and growing mechanization, does not occupy and modify all areas within the United States and its possessions, leaving no lands designated for preservation and

---

[30]     The Forest Supervisor stated her conclusion was supported by the "analysis within the [Guide]."

53

protection in their natural condition.  16 U.S.C. § 1131(a).  The
Act established a National Wilderness Preservation System composed
of "wilderness areas" which Congress directed "shall be
administered for the use and enjoyment of the American people in
such manner as will leave them unimpaired for future use and
enjoyment as wilderness."  Id.  The Act defines wilderness "in
contrast with those areas where man and his own works dominate the
landscape, . . . as an area where the earth and its community of
life are untrammeled by man, where man himself is a visitor who
will not remain."  Id. at § 1131(c).

It is against this backdrop that the court must evaluate the
Agencies' decision in this case.  The geographic context of this
Project is highly significant.  We are not considering the
application of rotenone in a *reservoir*, but rather a *stream* in the
Carson-Iceburg Wilderness, an unimpaired reference which would be
impacted over a two to three year period.  If the Project is
successful, all living organisms within that eleven mile stretch
of stream would be eradicated.

Also, significantly, this is not a case where an imminent
risk of extinction exists.  While defendants' counsel attempted to
argue that point at oral argument, *nowhere in defendants' papers*
did they argue, let alone, support this contention.  The record
establishes only a "moderate degree of threat for extinction" (UF
#62), and defendants have not proffered any evidence to establish
that the PCT is at imminent risk if the Project does not proceed
now.  At most, defendants cited, at the hearing, a 2008 report by
Moyle which concluded that the PCT have a high likelihood of
extinction in their native watershed within the next 50 years

*without continued intense monitoring and management*.  However, counsel conceded at oral argument that the Moyle report did not address this Project in particular; rather, the report drew its conclusions based on the general condition of the PCT.  The Moyle report does not establish that the PCT are at an imminent risk of extinction, and defendants cite no other record evidence to demonstrate such a risk.

In that regard, this case is wholly distinguishable from Wolf Recovery heavily relied upon by defendants.  There, the Idaho district court found that the use of helicopters to collect data on gray wolves in the Frank Church Wilderness was necessary to meet the minimum requirements for the administration of the area.  In doing so, however, the court was careful to note that that "case . . . present[ed] the most rare of circumstances. . . [where] man [was] attempting to restore the wilderness character of the area by returning the wolf [an endangered species]."  <u>Id.</u> at 1268.  Ultimately, the court's decision to permit the helicopter use rested on the conclusion that the wolf research was "designed to aid the restoration of a specific aspect of the wilderness character of the Frank Church Wilderness [namely, the recovery of the wolves] that had earlier been destroyed by man."  <u>Id.</u> at 1270.  The court also emphasized that the "collaring project and its use of helicopters [was] sufficiently *limited* and *focused* on restoring the wilderness character of the area."  <u>Id.</u> at 1269.

To the contrary, here, (1) the PCT is not an endangered species; (2) defendants have not established an imminent risk to the species should the Project not proceed; and (3) this Project

is not a transient intrusion, like in <u>Wolf Recovery Foundation</u>, but rather a two to three year injection of rotenone to a wilderness stream which will eradicate all living organisms within the stream.   Additionally, unlike <u>Wolf Recovery Foundation</u>, as well as <u>Wilderness Watch</u> and <u>High Sierra Hikers Ass'n</u>, the conservation efforts, in this case, on behalf of the PCT will be taken at the expense of other sensitive, and possibly rare or endemic, species.   That fact is undisputed.   Significantly, it also distinguishes this case from any others the court has reviewed.   Indeed, the parties did not cite, nor is the court aware of, any other case where a project was found to be compliant with the Act's mandates despite the elevation of the interests of one species over another.   While the court does not agree with plaintiffs' position that under the Wilderness Act, conservation interests can never trump the preservation of wilderness character[31], the court does find that in order to do so, the agencies must engage in a rigorous balancing of all relevant interests.

In <u>High Sierra Hikers Ass'n</u> and <u>Wilderness Watch</u>, the Ninth Circuit emphasized that if complying with the Act on one factor will impede progress towards another factor, when deciding whether the extent of the project is necessary, the Forest Service must determine the most important value and justify a decision to protect that value.   <u>See e.g.</u> <u>High Sierra Hikers Ass'n.</u>, 390 F.3d at 646.   That process involves a comparative and qualitative

---

[31]   (or as plaintiffs' counsel argued at the hearing, an agency can never play "species' favoritism," elevating the interests of one species over another)

analysis where the variables are considered in relation to one another and the interests at stake are weighed.

It is precisely that type of analysis that was not performed in this case.  The analysis is not contained within the Guide, and even were the court to independently consider the substantive findings of the Forest Supervisor's ROD, they too are insufficient.  Approving the Project, the Supervisor concluded: "The short term negative effects to Wilderness are balanced by restoration of a native species to its historic habitat within the Carson-Iceburg Wilderness."  (FS 5163.)  However, like the Guide, the ROD does not perform the requisite comparative and qualitative analysis.  While it does address more directly, and extensively, than the Guide the potential for long-term loss of aquatic invertebrates and the presence of rare and endemic species within the area (FS 5157-5161), it does not balance the various interests at stake, comparing them to one another, nor does it explain a basis to elevate the PCT's interests over the other species at risk.  The conclusory analyses set forth in both the ROD and the Guide are insufficient to met the Act's mandates.

At bottom, instead of choosing one competing value (conservation of the PCT) over the other (preservation of the wilderness character), the Agencies left native species, including invertebrate, out of the balance, and thus, improperly concluded that authorization of motorized equipment will comply with the Act by achieving the purpose of preserving wilderness character.[32]

---

[32]   In so holding, however, the court does not imply that the Agencies theoretically could not have complied with the Act and still chosen to implement the Project through Alternative Two.  For example, the Agencies could have first recognized that

**B.    Irreparable Injury**

In support of a finding of irreparable injury, plaintiffs offer the following evidence:  First, plaintiffs' expert Nancy Erman declares that long-term impacts to non-target aquatic invertebrates resulted from the last three-year long rotenone poisoning of upper Silver King Creek, in 1991-93.  Species monitoring in 1996 still showed major impacts to invertebrates, three years after agencies stopped treating the creek with rotenone.  (Decl. Of Nancy A. Erman [Docket #57-1], filed May 19, 2011, ¶ 4.)  Erman emphasizes that the Agencies here propose to apply rotenone with a concentration of 2 to 4.6 times the poison that they used in the 1991-93 project.  (Id. at ¶ 7.)  Second, Nancy Erman concurs with defendants' invertebrate experts that results of three longer-term, more intensively sampled studies in mountain streams suggest that while common invertebrate taxa will

---

two Wilderness Act values, the preservation of wilderness character and the conservation of species, were in direct conflict.  In other words, that in choosing the Proposed Action Alternative, the Agencies would meet the goal of preserving species but at the expense of degrading overall wilderness character.  Second, the Agencies could have recognized that the likely mortality of sensitive invertebrate species is the source of that conflict, as the elimination of any resident species will degrade wilderness character.  Third, the Agencies could have provided evidence of the choice to elevate the pursuit of the conservation value, despite the negative impacts to wilderness character.  A proper analysis would have discussed the threat to the PCT and its ESA listing in comparison to (possibly) the commonality of aquatic invertebrates in the Project area.  Stated differently, the requisite analysis would have evaluated the significance of conserving a species like the PCT in relation to avoiding the loss of potentially unlisted species.

But, this analysis was not performed in this case. Instead, the Agencies classify restoration of PCT as a *wilderness* benefit, and not a *conservation* benefit, without balancing the negative impacts that the Project will have on wilderness character.  For this reason, the Agencies have violated the Wilderness Act in approving implementation of the Project.

quickly re-colonize treated areas, rarer taxa may be eradicated
for a number of years or potentially forever.  (<u>Id.</u> at ¶ 18.)
Third, although defendants assert that invertebrate diversity will
recover through re-colonization, Nancy Erman maintains that
upstream seeps and springs will not serve as macroinvertebrate
refugia for post-project re-colonization.  (<u>Id.</u> at ¶ 26.)  Because
springs have constant or near-constant temperatures, organisms
living in them will not survive downstream in the Project area,
where temperatures are variable.  (<u>Id.</u>)  In addition, Erman
asserts that any rare invertebrate taxa killed by poisoning would
not also populate upstream habitat, because rare species occupy
highly specific stream gradients.  (<u>Id.</u> at ¶ 28.)  Therefore, if
re-colonization occured, only common taxa would re-inhabit the
Project area.  (<u>Id.</u>)  Fourth, Erman attests that loss of large
portions of emerging insects for several years during and
following the poisoning would be a major impact to riparian
animals in the area.  (<u>Id.</u> at ¶ 29.)  Emerging adult insects are a
major source of food for many terrestrial insects, spiders, birds,
amphibians, reptiles, and mammals.  (<u>Id.</u>)

Via Nancy Erman's declaration, plaintiffs have demonstrated a
likelihood of irreparable harm should the Project proceed.
Significantly, in the EIR/EIS, the Agencies admit that rotenone
treatment will kill sensitive macroinvertebrate species:  The
EIR/EIS found that the proposed application of rotenone would have
an adverse short-term effect on benthic macroinvertebrate
community composition through mortality of sensitive species.  The
Agencies concluded that the rotenone treatment would have a
stronger effect on small, gilled species (stoneflies, caddisflies,

mayflies) that are abundant in Silver King Creek and are typical
of cold-water, mountain streams.  (AR 270.)  While the Agencies
contend that those populations will recover in the Project area
when upstream populations re-colonize the poisoned area, mortality
of sensitive species is *likely*.  The question is whether the harm
that is likely to occur is irreparable.  On that issue, plaintiffs
have met their burden of showing that recolonization will not
occur for some species because they cannot adapt to the Project
area habitat, leading to the conclusion that mortality of
sensitive species will likely be *irreparable*.

**C.   Inadequacy of Monetary Damages**

Defendants do not dispute the well recognized principle that
"environmental injury, by its nature, can seldom be adequately
remedied by money damages."  Amoco Prod. Co., 480 U.S. at 545;
Monsanto Co. v. Geertson Seed Farms, 130 S.Ct. 2743, 2770 (2010).
As in most environmental cases, monetary damages will have no
value to plaintiffs if the asserted irreparable damage occurs as a
result of this Project.  Enjoining the Project would be the only
appropriate remedy in this case.

**D.   Balance of Equities and the Public Interest**

Here, the balance of equities tips in plaintiffs' favor and
issuance of an injunction is in the public interest.  First, as
set forth above, there is no exigency.  Defendants have not shown
that the PCT is in imminent threat of extinction.  Indeed, the PCT
listing for recovery under the ESA indicates only a "moderate
degree of threat for extinction."  (UF #62.)  Moreover, while the
2004 Revised Plan concludes that if the PCT remain only in their
currently occupied habitat, they will be "highly vulnerable to

extinction," defendants have not quantified this risk in years. (AR 33238.)  Defendants' counsel conceded at oral argument that he could not provide any citation to the record, providing a time frame for which this Project must proceed in order to ensure the PCT's conservation.  As was the case in <u>Californians for Alternatives to Toxics v. Troyer</u>, No. CIV-05-633-FCD-KJM, 2005 WL 2105343, at *2 (E.D. Cal. Aug. 31, 2005), defendants have not produced any convincing evidence that absent implementation of the Project this year or even in the next few years, the PCT would be at a real risk of extinction.  Defendants concede that six populations of PCT inhabit eleven and one-half miles of Silver King Creek, including above Llewellyn Falls, which provides some additional protection for the survival of the species.  (UF #33.) Finally, defendants' argument that exigency arises from the possibility of some catasphrophic event destroying the entire existing population of PCT in Silver King Creek does not convey immediacy.  (AR 32852.)  Such possibility always exists and is too speculative to permit this Project to go forward.

Second, the public interest in protecting wilderness areas weighs in favor of granting injunctive relief.  Plaintiffs aptly emphasize Congress' purpose in enacting the Wilderness Act:  "to secure for the American people of present and future generations the benefits of an enduring resource of wilderness."  16 U.S.C. § 1131(a).  The Ninth Circuit has repeatedly stressed the public purpose behind the Act, which twice states its overarching purpose that wilderness acres "shall be administered for the use and enjoyment of the American people in such a manner as will leave them unimpaired for future use and enjoyment as wilderness."  <u>High</u>

Sierra Hikers Ass'n, 390 F.3d at 648 (citing 16 U.S.C. § 1131(a)). The Ninth Circuit has specifically held that "because Congress has recognized the public interest in maintaining these wilderness areas largely unimpaired by human activity, the public interest [generally] weighs in favor of equitable relief." Id. at 643. The only competing public interest is that of restoring a native fish species.  But certainly, the public is not burdened if the court enjoins this Project.

Accordingly, for these additional reasons, injunctive relief is warranted in this case.

### CONCLUSION

Plaintiffs' motion for summary judgment is GRANTED in part and DENIED in part.  Plaintiffs have not demonstrated a violation of NEPA and therefore, their motion on that claim is DENIED. However, plaintiffs have shown a violation of the Wilderness Act because in choosing one competing value (the conservation of the PCT) over the other (preservation of the wilderness character), the Agencies left native invertebrates species out of the balance, and thus improperly concluded that authorization of motorized equipment will comply with the Act by achieving the purpose of preserving wilderness character.

Having shown a violation of the Wilderness Act, plaintiffs are entitled to a permanent injunction, enjoining implementation of the Paiute Cuttroat Trout Restoration Project because: (1) through the expert declaration of Nancy Erman, they have demonstrated that the rotenone treatment will kill sensitive macroinvertebrate species and that recolonization will not occur for some species because they cannot adapt to the Project area

habitat; (2) the balance of equities tips in their favor as no
exigency exists to begin the Project now; and (3) the public
interest favors preservation of the unimpaired wilderness.

Accordingly, IT IS HEREBY ORDERED that defendants, and each
of them, and their respective agents, partners, employees,
contractors, assignees, successors, representatives, permittees
and all persons acting under authority from, in concert with, or
for them in any capacity, including in a volunteer capacity, are
enjoined from allowing to be conducted or conducting any component
of the Paiute Cutthroat Trout Restoration Project, including
specifically any application of rotenone formulations and
potassium permanganate to Silver King Creek and its tributaries
in the Carson-Iceberg Wilderness in Alpine County, California.

Defendants' cross-motion is accordingly DENIED with respect
to plaintiffs' Wilderness Act claim.  However, defendants' motion
is GRANTED with respect to plaintiffs' NEPA, ESA and Clean Water
Act claims.

IT IS SO ORDERED.

DATED: September 6, 2011

_____
FRANK C. DAMRELL, JR.
UNITED STATES DISTRICT JUDGE